**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**UNITED STATES AIR CONDITIONING CORPORATION et al., Respondents.**

**No. 5927.**

United States Court of Appeals
First Circuit.

May 10, 1962.

Samuel M. Singer, Attorney, Washington, D. C., with whom Stuart Rothman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Richard C. Hotvedt, Attorney, Washington, D. C., were on the brief, for petitioner.

Chris Byron, New Bedford, Mass., with whom Charles R. Desmarais and Charles A. Adams, New Bedford, Mass., were on brief, for respondents.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

HARTIGAN, Circuit Judge.

This is a petition by the National Labor Relations Board for enforcement of its order [1] issued October 18, 1961 against Scott Manufacturing Company, Ace Cabinet Corporation and United States Air Conditioning Corporation, (hereinafter referred to as Scott Mfg. Co., Ace and U.S. Air, respectively) pursuant to Section 10(e) of the National Labor Relations Act, as amended (61 Stat. 136, 29 U.S.C.A. § 151 et seq.).

Ace is a Massachusetts corporation engaged in the sale and distribution of

1. The Board's decision and order are reported at 133 NLRB No. 107.

clothes dryers, refrigeration cabinets and related products in New Bedford, Massachusetts. Until December 1960 Ace also had been engaged in manufacturing these products. In 1958, U.S. Air, a Delaware corporation, acquired Ace. Thereafter Ace continued to operate as a wholly owned subsidiary and was included within the consolidated federal income tax return filed by U.S. Air. As a manufacturer and distributor of air conditioning, heating, and related equipment, U.S. Air supplied Ace with many of the component parts for Ace clothes dryers.

Glenn W. Way is president of both U.S. Air and the Ace corporation and is the dominant shareholder in U.S. Air.[2] Of special relevance to the present proceeding, it was stipulated by respondents at the hearing before the Trial Examiner that Glenn Way controlled the labor relations of both Ace and U.S. Air in that any collective bargaining contract involving these corporations had first to be approved by Mr. Way.

In September 1958, Local 292, International Union of Electrical Workers, (AFL–CIO) (hereinafter referred to as the Union), was certified by the Board as the collective bargaining representative of the production and maintenance employees of Ace. In March 1959, on behalf of Ace, Way entered into a bargaining agreement with the Union, which was to extend until March 1, 1961 and from year to year thereafter.

With no prior notice to the Union, on December 8, 1960 Way caused Ace to post a notice on the company's bulletin board stating that Ace would terminate its operation on December 16. On December 16, Ace's twenty-seven production employees—all members of the Union—were discharged. On that date Ace left a production line of uncrated goods in various stages of completion.

In January 1961, Scott Mfg. Co. was organized as a Massachusetts corporation, doing business at the same address as Ace and manufacturing the same products as Ace did. The plant which had closed as Ace on December 16, 1960, reopened on January 16, 1961, as Scott Mfg. Co. The president and sole shareholder of Scott Mfg. Co. was Anderson W. Scott, the former sales manager of Ace.

The new corporation's first work after opening was to complete the various dryers and cabinets which had been left standing on Ace's production line. In February 1961 Scott and Way entered into a written subcontracting agreement which declared that it expressed the parties' "meeting of the minds" since January 16. This agreement provided that its purpose was to "sub-contract the actual manufacturing of [Ace's] products." Under the agreement, Ace continued to be "responsible for the furnishing of quarters in which to work, all machinery required to do the work and all material required to do the work." Ace remained responsible for all public liability insurance, including product liability insurance, "in exactly the same manner as would be true if Ace Cabinet Corporation were doing all the manfacturing itself."

According to the terms of the agreement, Scott Mfg. Co. was responsible for furnishing manpower and supervision in the production of Ace products. Ace was to pay Scott Mfg. Co. weekly stated sums for each product delivered to Ace for sale to the trade. Finally, the agreement provided that "Ace Cabinet Corp. shall be able to discontinue the operation and terminate this agreement with Scott Manufacturing Co. on thirty days notice."

Though now styled as "clerk" for Ace, Paul DesJardins, Ace's former production manager, continued to be responsible for the management of the sales office, inventory, and raw materials for the entire enterprise and regularly inspected the Scott Mfg. Co. shop to check on the quality of work. At the hearing DesJardins testified: " * * * if I see something wrong, I am able to put my finger to stop it before it goes any fur-

2. Glenn W. Way and his wife's estate own 63.9% of the outstanding capital stock of U. S. Air.

ther." Scott Mfg. Co. employed no foreman.

As noted previously Scott Mfg. Co.'s new president, Anderson W. Scott, had previously served as sales manager of Ace. At the hearing he testified that he lacked experience in manufacturing and there was testimony that he continued to spend much of his time in the field as a sales and service man for Ace products—the same as had obtained prior to the demise of Ace as a manufacturer. Ace supplied clerical assistance to Scott Mfg. Co. for which it paid no compensation. Ace also paid the rent for the entire factory and for the heat and electricity. Ace and Scott Mfg. Co. share one telephone number. All cabinets and dryers are still stamped Ace.

At the hearing there was testimony that Way, in considering whether or not to reopen the plant, had stated that he was hoping to bring in a man with "fresh money." The new money which Anderson Scott brought into the business amounted to $5,000, an amount which he himself admitted at the hearing was minute. U.S. Air originally paid $165,-000 for Ace's name and good will in 1958 and Way testified that he had put $600,-000 into the business since that time. Ace's machinery and inventory are presently worth $265,000. Scott's $5,000 was used to meet the first two week's payroll and he testified that he did not feel that he risked anything in the venture.

When Ace closed its doors on December 16, 1960 its entire force of production and maintenance employees were members of the Union, working under a collective bargaining agreement. When the plant reopened on January 16, 1961, it was completely non-union. There was testimony that in the period between the closing of Ace and the opening of Scott Mfg. Co., Way had summoned Romeo Tetrault—the Union president—to his office and sought to extract a promise from him that the Union would not start "trouble" if the plant were reopened under new management. Tetrault testified that Way had informed him that the men would not be recalled in order of seniority and that he didn't "want to have anybody that has any connection with the Union in this plant here."

There was further testimony that during January 1961 Anderson Scott contacted several former Ace employees and asked them to return to work. He offered $1.25 per hour, approximately sixty cents less per hour than the employees had been guaranteed under their former contract and he stated that the new positions would be without seniority and without a union contract.

About January 9, 1961, former Ace employee and chief union steward Correia sought to speak to Scott on the telephone about arranging a meeting in which the impending situation could be reviewed. Correia stated that Scott said that he was too busy to talk. Correia attempted to reach Scott on two subsequent occasions but was unsuccessful. On January 24 the Union mailed a grievance to Scott in which it asserted that Ace had evaded its obligations under the bargaining agreement which had been in force between Ace and its former union employees. The Union received no reply.

■ Upon a consideration of the foregoing facts the Board found that respondents could be deemed to constitute a single employer or joint enterprise, and consequently accountable for the unfair labor practices. The Board concluded that respondents violated Section 8(a) (1) and (3) by shutting down the Ace plant and discharging twenty-three employees in order to avoid dealing with the Union and to evade the contract benefits obtained by the Union for its members.[3]

---

3. The Board also concluded that respondents violated Section 8(a) (1) and (5) of the Act by failing to bargain with the Union concerning the shutdown and reopening of the plant and by unilaterally and directly dealing with the employees concerning their recall and terms and conditions of employment in the new plant. Inasmuch as we agree with the Board's initial finding, we need not consider this aspect of the order.

We believe that the record amply supports the Board's findings and agree with the Board that:

"Way, the one controlling individual in all three corporations—so far as operation and function is concerned—neither went out of business nor moved the plant. He merely shut the doors for about 30 days, leaving many unfinished products on the floor, paid off his production employees and effectively discharged them, and then resumed precisely the same production of the same product at the same place with the same management individuals. Neither the incorporation by Scott nor the contractual arrangement between him and Way—which the latter admitted was designed by himself—created a new and separate enterprise. The real, as against the corporate employer, entity stands out clear and unmistakeable. (sic)

"Scott remains as the effective instrument of Way's judgment and authority, as Way in substance admitted. Way must be held accountable, * * * for Scott's failure to honor the union contract and to recall without unlawful restrictions the employees who were summarily laid off on December 16.

"And the facts of Scott's prompt and unequivocal refusal to recognize and deal with the Union firmly support the inference, * * * that the chief reason his principal, Way, shut down the plant and released the employees in December was to deprive such employees of wage and employment rights gained through their lawful bargaining agent, the Charging Union."

Throughout this proceeding Way has maintained that his reasons for closing the plant were purely economic—that the former Ace operation had been losing some $7,000 a month. He introduced no evidence to this effect and thus the matter became largely one of credibility with the Board choosing between two conflicting views of the evidence. So long as the view which the Board embraced is supported by substantial evidence—as was assuredly true in this case—that determination will not be set aside here. National Labor Relations Board v. Walton Manufacturing Company and Loganville Pants Company, 82 S.Ct. 853; Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

In sum, we believe that this record presents a classic example, as Justice Jackson put it in Southport Petroleum Co. v. National Labor Relations Board, 315 U.S. 100, 106, 62 S.Ct. 452, 86 L.Ed. 718 (1942), of "merely a disguised continuance of the old employer," which artifice was resorted to in the instant case in an attempt to evade and avoid contractual and statutory bargaining rights. As such the order of the Board was eminently proper. See N. L. R. B. v. Ozark Hardwood Company, 282 F.2d 1 (8 Cir.1960); N. L. R. B. v. Kelly & Picerne, Inc., 298 F.2d 895 (1 Cir.1962).

A decree will be entered enforcing the order of the Board.