sufficient evidence for the jury to find premeditation beyond a reasonable doubt.

## IV.

We have concluded that the trial court did not err in permitting the Government to cross-examine Cruz regarding Roldan's prior conviction. We have also concluded that there was sufficient evidence of premeditation to support Roldan's conviction for first degree murder. We will therefore affirm the district court's March 16, 1979 judgment of sentence imposed upon Roldan.

**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SCOTT PRINTING CORPORATION and J & J House of Composition, Respondents.**

No. 79–1137.

United States Court of Appeals, Third Circuit.

Argued Oct. 15, 1979.

Decided Dec. 28, 1979.

Carol A. De Deo, Eric G. Moskowitz (Argued), Attys., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D. C., for petitioner.

Hugh P. Husband, Jr., New York City, for respondents.

Before SEITZ, Chief Judge, and GARTH and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Chief Judge.

This case is before the court on the application of the National Labor Relations Board (the Board) for enforcement of an order directed against Scott Printing Corporation (Scott Printing) and J & J House of Composition (J & J). The Board adopted the findings, conclusions, and order of the administrative law judge (ALJ), who held that the sale of Scott Printing's composing room to J & J was a sham transaction and that Scott Printing had refused to bargain with Jersey City Typographical Union No. 94 (the Union) in violation of §§ 8(a)(5) and (a)(1) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(5), (a)(1) (1976).

I.

Scott Printing has operated a commercial printing plant in Jersey City for over forty years. The controversy here centers on the sale of Scott Printing's composing room, whose employees have constituted a bargaining unit represented by the Union for approximately ten years. At all times ma-

terial to this case, Scott Printing's day to day operation has been managed by Gerald Scott (Scott), its executive vice-president and part owner. During the past decade technological advances in the industry have made it possible for many of Scott Printing's customers to do work themselves that formerly was done in the composing room. Consequently, there has been a steady decrease in the demand for composition work, and the number of men employed by Scott Printing in its composing room has declined from over 50 in 1967 to 3 in 1976. Because of the unprofitability of the composing room, in mid-1976 Scott decided to sell it. In October 1976, he placed advertisements in two newspapers, but was unsuccessful in finding a buyer.

The most recent in a series of collective bargaining agreements between Scott Printing and the Union covering the composing room employees expired on December 31, 1976. Pursuant to Union demands, Scott entered into negotiations for a new agreement on November 30, 1976. At this initial meeting Scott and the Union discussed several proposals submitted by the Union, including requests for increases in pension benefits and wages.

The same parties met again on December 20, 1976. Scott informed the Union of the poor market demand for composition work and that he was having difficulty competing with non-union composition done in New York. At this meeting the Union withdrew most of its proposals and began to negotiate from the old contract. Although there was conflicting testimony, the ALJ credited the testimony of Scott, who stated that he informed the Union of his plan to sell or to close down the composing room for the first time at this meeting. A letter from Scott to the Union dated December 22, 1976, confirmed these plans.

In light of this disclosure, the focus of the negotiations shifted at the third bargaining session held on December 27, 1976. The Union bargained for extension of severance pay and pension and welfare benefits beyond the expiration of the current contract. Because he still had not found a buyer,

Scott suggested a two week extension of the old contract. The Union proposed a one month extension, which included the wage increases for which it had been bargaining, and the parties agreed to so extend the contract until January 28, 1977.

Directly after the December 27 meeting, Union representatives met with Varsalona, Peters, and Lane, the three composing room employees. The employees were informed of Scott's plan to sell or to shut down the composing room. When they asked about other employment opportunities, they were told that no permanent positions were open and that they would have to take their chances substituting at another shop.

In mid-January, Varsalona approached Scott and asked him if he would consider an offer to buy the composing room from himself and Peters.[1] Scott expressed interest, and during the next two weeks Varsalona and Scott discussed the basic terms of the sale in several informal meetings. Scott then instructed his attorney to draft a contract for the sale. While the attorney was performing this task, representatives of Scott Printing and the Union met for the last time on January 25, 1977. Most of the discussion at this meeting focused on severance pay, and the Union still did not know that Scott had been negotiating with the composing room employees about a sale.

On January 31, 1977, Scott presented Varsalona and Peters with the written contract. It provided that Varsalona and Peters, acting as J & J House of Composition, would buy the composing room and take over its operation. The contract on its face was a standard one, the only unusual term being that the initial down payment was only $1,000 for the purchase of a going concern priced at $30,000. Varsalona and Peters also agreed to pay $9,000 · to rent space in Scott Printing's production room for the first year.

On the same day that the contract was signed, the Union learned about the sale. After Scott confirmed the transaction, the Union called the new owners of the compos-ing room and asked Varsalona to negotiate a collective bargaining agreement. Varsalona refused, stating that he and Peters did not want union representation and that they were going to drop out of the Union. Approximately two weeks later, both Varsalona and Peters did resign from the Union.

The Union filed unfair labor practice charges against Scott Printing and J&J alleging that both companies had unlawfully refused to bargain with it. After a hearing on the Board's complaint, the ALJ concluded that the sale of the composing room was a sham and that J&J was operating as Scott Printing's alter ego. Because . he found that Scott Printing had created J&J to evade its duty to bargain with the Union, the ALJ ordered that the sales contract be rescinded, that the management of the composing room be restored to Scott Printing, and that Scott Printing resume bargaining with the Union. The Board affirmed the rulings, findings, and conclusions of the ALJ and adopted his order except for a modification of the form of notice required to be posted by Scott Printing.

## II.

The Board's complaint charged that Scott Printing and its alter ego J&J refused to bargain collectively with the Union and thereby interfered with the exercise of rights protected by § 7 of the National Labor Relations Act, 29 U.S.C. § 157 (1976) (the Act). Scott Printing argues that J&J is not its alter ego but rather is an independent business entity that is its prime supplier of composition work. It is well established that an employer cannot avoid its obligations under the Act merely by forming a new business entity. Thus, if J&J is found to be Scott Printing's alter ego, its refusal to bargain after the Union's January 31, 1977, request can be attributed to Scott Printing. *See Manley Transfer Co. v. NLRB*, 390 F.2d 777 (8th Cir. 1968); *NLRB v. United States Air Conditioning Corp.*, 302

---

1. When told of the impending sale of the composing room, Lane deposited his Union card at Jersey Printing Company. He eventually was given a full time position at that company.

F.2d 280 (1st Cir. 1962). *See also Howard Johnson Co. v. Detroit Local Joint Exec. Bd.*, 417 U.S. 249, 259 n.5, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974). In determining whether a successor entity is an alter ego, courts have focused on whether the sale is a "*bona fide* continuance and a true change of ownership . . . or merely a disguised continuance of the old employer." *Southport Petroleum Co. v. NLRB* 315 U.S. 100, 106, 62 S.Ct. 452, 456, 86 L.Ed. 718 (1942) (emphasis in original). A nominal change in ownership is not dispositive, *see NLRB v. Ozark Hardwood Co.*, 282 F.2d 1, 5 (8th Cir. 1960), and the Board must, of necessity, examine the actual operation of the new business in making its decision.

The duties of Varsalona and Peters remained virtually unchanged after the sale. They used the same equipment and continued to work in Scott Printing's production area surrounded by Scott Printing's pressmen in an unpartitioned room. Although Scott testified at the ALJ hearing that J&J had made its first rent payment on time, Varsalona admitted that J&J never had made that payment. It is undisputed that J&J and Scott Printing never entered into a commercial lease as required by the sales agreement.

Varsalona testified that at the time of the hearing J&J still was using supplies purchased by Scott Printing. Although he believed that the supplies were included in the purchase price of the composing room, the contract was silent with respect to such items. The record also establishes that there was considerable intermingling of the two companies' intra-office affairs. J&J used Scott Printing's accountant to do its bookkeeping. Scott testified that J&J occasionally used Scott Printing's typist and messenger service without charge. J&J's mail was received at Scott's Printing's address and sorted by a Scott Printing receptionist before it was delivered to J&J. These facts establish that there was no real change in the operation of the composing room after the sale to J&J. The crucial element in a decision to apply the alter ego doctrine, however, is a finding

that the older company continued to maintain a substantial degree of control over the business claimed to have been sold to the new entity. *See NLRB v. Bell Co.*, 561 F.2d 1264, 1267–68 (7th Cir. 1977); *NLRB v. Herman Bros. Pet Supply, Inc.*, 325 F.2d 68, 70–71 (6th Cir. 1963). The sales contract in this case gave J&J the right to refuse jobs offered to it by Scott Printing and a right to bid on work for other customers. Varsalona testified that he and Scott dickered over price terms in order to arrive at a figure that allowed both of them to make a profit. However, he admitted that he could not recall ever having turned down work offered him by Scott Printing. Moreover, he stated that J&J had never done work for any customer but Scott Printing. In our view, substantial evidence supports the ALJ's conclusion that Scott Printing controlled the workload of J&J, thereby controlling the very existence of the new company and the income of its owners.

Scott Printing's domination of J&J also is evidenced by the method by which J&J had its legal work done. Every time J&J had a legal problem, either Varsalona or Peters approached Scott for help. The legal matter then would be handled by Scott Printing's attorney. For example, when J&J decided to incorporate, Varsalona went to Scott, who arranged to have his attorney prepare the certificate of incorporation. The document was prepared without consulting either Varsalona or Peters, and it was kept in the attorney's office for more than a month before it was shown to Varsalona. There is no evidence that J&J ever was billed for this service. Similarly, when J&J was served with a subpoena duces tecum requesting it to bring certain documents to the ALJ hearing, the documents were brought to the hearing by Scott and his attorney without the knowledge of Varsalona and before the attorney had discussed the significance of the documents with either Varsalona or Peters.

This evidence clearly establishes that Scott Printing continued to control the operation of the composing room after the sale and that the day to day operation of

the room did not change. We conclude that substantial evidence supports the ALJ's finding, affirmed by the Board, that J&J was the disguised continuance or alter ego of Scott Printing.

## III.

Scott Printing asserts that even if J&J is held to be a disguised continuance, the alter ego doctrine cannot be applied to create liability against it because there is no evidence to support the ALJ's conclusion that Scott Printing created J&J for the purpose of continuing its composing business while avoiding its obligation to bargain with the Union. Assuming without deciding that in this case the General Counsel must prove that Scott Printing intended to evade its duty to bargain, we find that there is substantial evidence to support the ALJ's conclusion.

When, as in this case, the findings of the ALJ are affirmed by the Board, they must be accepted if they are supported by substantial evidence, taking into account the record as a whole. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The substantial evidence standard also applies to inferences made from findings of fact, *NLRB v. Eagle Material Handling, Inc.*, 558 F.2d 160, 164 n.6 (3d Cir. 1977), and because there often is no direct evidence of antiunion motivation, the Board may rely on circumstantial evidence to prove such intent. *NLRB v. Long Island Airport Limousine Service Corp.*, 468 F.2d 292 (2d Cir. 1972). *See also NLRB v. Locals 542, 542–A & 542–B, Int'l Union of Operating Eng'rs*, 485 F.2d 387 (3d Cir. 1973).

The ALJ relied on several facts in reaching his decision. First, economic factors made it desirable for Scott Printing to rid itself of the Union. The evidence established that the demand for Scott Printing's composing room services had declined markedly in the past decade. Therefore, Scott tried unsuccessfully to sell the composing room in October and November of 1976. When he was unable to sell he began to bargain with the Union, but complained that the composing room was becoming increasingly unprofitable and that he was having difficulty competing with non-union work done in New York.

Second, the ALJ also found that the negotiations for the sale of the composing room and the contract itself evidenced Scott Printing's unlawful intent. Even though Varsalona came to Scott with an offer to buy the composing room, a close examination of the negotiations reveals that Scott was the motivating force behind the sale and the source of the contract's terms. Scott totally controlled the negotiations. The record shows that Varsalona and Peters agreed to the sale only to avoid unemployment. For example, Peters stated that "listen, it sounded an awful lot better than $96 a week unemployment. And I was a little too old, a little too proud to settle for $96 a week." The negotiations were limited at best. Although the sale price and agreed upon rent totalled almost $40,000, Scott testified that he discussed the sale with Varsalona only six to nine times, and only twice for longer than five minutes. And when Varsalona asked Scott if he should get his own attorney, Scott responded that such action would be unnecessary and that he would have his own attorney take care of the contract.

Scott presented the sales contract to Varsalona and Peters on January 31, 1977. This was the first time that either of the employees had seen a written copy of the agreement, but both of them signed it on that same day without making or suggesting any changes. Varsalona signed it even though he believed that the composing room machinery was not worth the contract price because "there was no other jobs available," and "I felt I had nothing to lose." Peters similarly testified that the sale "meant that I would have full employment and that was the only thing I was truthfully concerned on." Peters' understanding of the contract terms is illustrated by his statement that "I don't know any more about [the] contract than the wall."

Despite the lack of input by Varsalona and Peters into the sales agreement, its terms were very favorable to them, especially the $1,000 down payment on a transfer of $30,000 of equipment. Scott explained that "[o]ur interest . . . was to have this work. That's why we gave them a honeymoon deal and I didn't want them to have any undue expenses." From this evidence the ALJ concluded that the purpose behind the creation of J&J was to keep the composing room work under Scott's control, even if Scott had to pay J&J's expenses to fulfill the plan.

The final evidence relied upon by the ALJ to find that Scott used J&J to evade its duty to bargain was the operation of the composing room after the sale. This evidence is discussed more fully in Part II. Here it is sufficient to note that Varsalona and Peters did in fact receive a honeymoon deal. J&J used Scott Printing's supplies, messenger service, typist, and even its attorney without charge. The business operation did not change, and Scott still controlled the amount of work done in the composing room. Moreover, in his testimony before the ALJ, Scott admitted that his competitive position under this arrangement with J&J was better than it would have been if he had signed a contract with the Union and that he would not have entered into the agreement unless it was to his financial advantage to do so.

Thus, when the sale of the composing room is analyzed from beginning to end, the evidence establishes that a decline in the demand for composition work made the composing room unprofitable for Scott. Because he was having difficulty meeting non-union competition, Scott tried unsuccessfully to sell the composing room. After the Union informed the composing room employees that Scott intended to sell or to close down the composing room, Varsalona and Peters, facing unemployment, offered to buy it. Following several short, informal negotiations, Scott ordered his attorney to draft a contract for the sale of the composing room according to terms prescribed by Scott. Before they had even consulted an attorney, Varsalona and Peters signed the contract without making any changes. Scott admitted both that he gave the employees favorable terms to prevent them from having any undue expenses and that he was better off under this arrangement than he would have been had he signed a contract with the Union.

From this evidence the ALJ concluded that J&J was created by Scott "to continue in the composing room business while avoiding the necessity of negotiating with the Union." Keeping in mind that in reviewing Board decisions under the substantial evidence standard, "[w]e cannot displace the Board's selection between two conflicting views of the evidence, 'even though the court would justifiably have made a different choice had the matter been before it *de novo*,'" *NLRB v. Craw*, 565 F.2d 1267, 1270 (3d Cir. 1977) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951)), we hold that there is substantial evidence on the record to support the ALJ's decision.

### IV.

Scott Printing's final argument is that even if it is held to have a duty to bargain with the Union because J&J is its alter ego, its failure to bargain did not constitute an unfair labor practice because it had a good faith doubt as to the Union's continuing majority support. *See Toltec Metals, Inc. v. NLRB*, 490 F.2d 1122 (3d Cir. 1974); *NLRB v. Frick Co.*, 423 F.2d 1327 (3d Cir. 1970). This contention is based on Varsalona's statement of January 31, 1977, made after the sham sale, that he and Peters did not want union representation and their subsequent resignation from the Union. This issue was not addressed by the ALJ, and Scott Printing filed an exception to the ALJ's opinion alleging that the ALJ erred by failing to find that the Union did not represent a majority of the composing room employees after January 31. Because the Board merely adopted the findings and order of the ALJ, there are no findings on the record concerning the good faith doubt defense.

■ The alleged violations of §§ 8(a)(5) and (a)(1) in this case both were based on Scott Printing's and J&J's refusal to bargain with the Union after the sham sale of the composing room. In the absence of any articulated reasons for rejecting Scott Printing's good faith doubt defense, we cannot say whether its refusal to bargain amounted to an unfair labor practice. On this record, it is unclear whether Scott Printing would have been permitted to advance such a defense. *See Franks Bros. Co. v. NLRB*, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020 (1944); *NLRB v. Quality Markets, Inc.*, 387 F.2d 20 (3d Cir. 1967). Therefore, we think it proper to remand this case to the Board to have it determine whether Scott Printing would have been allowed to assert the good faith doubt defense, and, if the Board finds that this defense was not available, it should then determine what remedy is appropriate. Of course, if the Board concludes that the defense was available to Scott Printing, it must determine whether Scott Printing's failure to bargain was in fact based on a good faith doubt as to the Union's continuing majority support, and if not, determine an appropriate remedy.

### V.

We will deny enforcement of the Board's order and will remand to the Board to decide the good faith doubt issues in a manner consistent with this opinion.

SLOVITER, Circuit Judge, dissenting.

The Board's order in this case can be enforced against Scott only if there is substantial evidence to support its finding that "J & J was created by Scott for the sole purpose of continuing its composing room business, J & J functioning as Scott's alter ego, to avoid its statutory obligation to bargain with the Union." It can be enforced against J&J only if J&J is functioning as Scott's alter ego. The record is totally devoid of any evidence to support a finding that J&J was created by Scott "to avoid its statutory obligation." There is no precedent which would support application of the

alter ego doctrine to this situation, and no policy reason has been advanced by the majority in support of the extension of that doctrine to a situation where no evidence of any antiunion animus appears on the record.

The alter ego doctrine has been infrequently invoked and even less frequently analyzed. It represents a departure from the generally accepted principle that an employer's freedom to contract includes the right to transfer its assets, reorganize its business or close a portion thereof without imposing on its vendee the obligation to adopt its labor contract. *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272, 282–84, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972); *Textile Workers Union v. Darlington Manufacturing Co.*, 380 U.S. 263, 268–69, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965). In the main, national labor policy is based on voluntary action by both employers and employees. This freedom of choice is tempered to some extent by the need to effectuate the national policy to promote peaceful settlement of industrial conflicts. Although the national labor laws do not address the issue of employer successorship, labor policy has impelled the Board and the courts to fashion principles by which companies succeeding to the business of a predecessor employer must, in some circumstances, recognize and bargain with the incumbent union, *NLRB v. Burns International Security Services, Inc., supra*, or arbitrate the extent to which the successor was obligated under the collective bargaining agreement. *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964).

However, even when there has been identity of the business, an unchanged bargaining unit, and a majority of employees hired by the new employer who were represented by a recently certified bargaining agent, the Court has refused to require that the successor employer be bound by the old collective bargaining contract. As the Court noted:

A potential employer may be willing to take over a moribund business only if he

can make changes in corporate structure, composition of the labor force, work location, task assignment, and nature of supervision. Saddling such an employer with the terms and conditions of employment contained in the old collective-bargaining contract may make these changes impossible and may discourage and inhibit the transfer of capital.

*NLRB v. Burns International Security Services, Inc.,* 406 U.S. at 287–88, 92 S.Ct. at 1582.

Therein lies the distinction between the successor cases and the alter ego cases. In those cases in which the succeeding corporation has been denominated an alter ego, it is not free to reject the previously existing collective bargaining contract or relationship. Since the "new" employer is considered the same employer in fact as the predecessor, it, unlike the mere successor, is responsible for the predecessor's labor obligations. Because this imposes an obligation at variance with that ordinarily imposed on a subsequent employer, its application has been limited to "situations in which a technical change in employer identity is merely incident to the former employer's attempt to disguise its continuance because of that employer's union animus or an unlawful motive to avoid the commands of national labor laws." Slicker, *A Reconsideration of the Doctrine of Employer Successorship—A Step Toward a Rational Approach,* 57 Minn. L.Rev. 1051, 1064 (1973). The alter ego cases have been characterized as instances of "intentional employer evasiveness." T. Kheel, Labor Law § 17.02[3] (1972). See *United Telegraph Workers v. NLRB,* 187 U.S.App.D.C. 231, 571 F.2d 665, 669–70 (D.C.Cir. 1978) (Bazelon, C. J., dissenting).

The cases in which the doctrine has been applied support this limitation. In *Southport Petroleum Co. v. NLRB,* 315 U.S. 100, 62 S.Ct. 452, 86 L.Ed. 718 (1942), apparently the first Supreme Court recognition of the alter ego doctrine in labor cases, the predecessor corporation had been found guilty of unfair labor practices and discriminatorily discharging three employees. After ignoring directions to follow the NLRB orders, it entered into a stipulation of obedience to the Board order. Three days after it executed that stipulation, it distributed its assets to its four stockholders as a liquidating dividend, and sought to be relieved of its obligations under the stipulation. The case reached the Supreme Court on the circuit court's refusal to grant the employer leave to adduce this additional evidence before the Board, and was affirmed on the ground that the circuit court acted within its discretion in refusing to order opening of the proceedings because the proffered evidence was not material. The Court stated:

> Implicit in the reinstatement provision of the Board's order was a condition of the continued operation by the offending employer of the refinery to the employment of which the illegally discharged employees were to be restored. Such operation might have continued under the old business form *or under a disguise intended to evade this provision.* (emphasis added).

315 U.S. at 106, 62 S.Ct. at 456.

Antiunion animus or intent to evade labor obligations was also evident in the other cases cited by the majority. Thus, in *Manley Transfer Co. v. NLRB,* 390 F.2d 777 (8th Cir. 1968), before forming a new corporation the employer had engaged in unfair labor practices, threatened the employees with discharge if they did not abandon their union activities, and offered them a wage increase. In *NLRB v. Ozark Hardwood Co.,* 282 F.2d 1 (8th Cir. 1960), there had been prior findings that the employer had interfered with and coerced the employees and had discriminatorily discharged some employees for union activity. See *NLRB v. Ozark Hardwood Co.,* 194 F.2d 963 (8th Cir. 1952). In *NLRB v. Herman Brothers Pet Supply, Inc.,* 325 F.2d 68 (6th Cir. 1963), there was no dispute as to the occurrence of unfair labor practices, such as the employer's statement to several employees that "he would never sign a union contract, and . . . . he would close his business before admitting the union." *Id.* at 70. In *NLRB v. United States Air Conditioning Corp.,* 302 F.2d 280 (1st Cir. 1962), the corporate restructuring changed no management personnel but resulted in the firing of the

production employees of a subsidiary, all of whom were union members. There was also testimony which clearly indicated the antiunion bias of the controlling individual. *Id.* at 282. The same showing of antiunion bias may be found in other cases relied on by the Board in its brief. In *Reynolds Pallet & Box Co. v. NLRB*, 324 F.2d 833 (6th Cir. 1963), the employer engaged in coercive conduct during a campaign to organize the employees and discriminatorily discharged employees because of their union activity. In *NLRB v. Hopwood Retinning Co.*, 104 F.2d 302 (2d Cir. 1939), the employer had locked out and discharged employees because of their union activity. See *NLRB v. Hopwood Retinning Co.*, 98 F.2d 97 (2d Cir. 1938). In *Parklane Hosiery Co.*, 203 NLRB 597 (1973), there was a history of resistance to unionization and some evidence of intimidation by management of employees it thought were interested in unionization.

The facts of this case more closely approximate those in *NLRB v. Bell Company*, 561 F.2d 1264 (7th Cir. 1977) where the court refused to find that the role of the former owners in setting up the new company demonstrated that the succeeding company was the alter ego of the former. The NLRB itself has refused to apply the alter ego doctrine where the record fails to show discontinuation of the former company was fraudulent or illusory or was designed as a subterfuge to evade its bargaining obligations to the union. *Universal Electric Co.*, 227 NLRB 1790 (1977).

Viewing the evidence in this case in light of the precedent, the difference in fact situation is striking. There is no suggestion that Scott's efforts and attempt to sell the composing room were not made in good faith. The impetus for the formation of the new company, J&J, came not from Scott but from the employees themselves. A representative of the Union, not of Scott, notified the employees that the composing room would be shut down. A representative of the Union, not Scott, painted a dismal picture for alternative employment. It was the employee, Varsalona, not a representative of Scott who first raised the possibility of purchase of the composing room with another employee. It was the employee who proposed the idea to Scott, not the converse. There was no pending unfair labor practice charge against Scott, nor was Scott operating under any NLRB order. As a result of the transaction, Varsalona and Peters undertook the binding obligation to pay the purchase price of $30,000 for equipment and $9,000 additional for the rental of the property. It is true that once the employees initiated the discussion of their purchase of the composing room, Scott made every effort to assist them in the formation and operation of the business. The majority bridges the gap by making an *inference* of unlawful intent from the negotiations and the favorable contract. While Scott's motivation may have been self-serving rather than eleemosynary, no other case has previously translated a sweetheart relationship into a sham relationship.

There are strong policy reasons to distinguish between this situation and the formation of a company for antiunion reasons or to avoid an outstanding order. In the latter situation, it is necessary to overlook the corporate technicalities in order to prevent subversion of the NLRA process and frustration of national labor policy. On the other hand, in the absence of evidence of such an unlawful motive, the courts have effectuated the countervailing policy that employers can use their business judgment in closing or selling plants or portions thereof. *Textile Workers Union v. Darlington Manufacturing Co., supra.* The extension of the alter ego doctrine in this case and the enforcement of the Board's order which required rescission of the contract of sale means that Varsalona and Peters will have lost the opportunity to become entrepreneurs. There is nothing in labor policy which justifies the court under these facts to foreclose them from this economic mobility.