

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-26-2007

# Trafford Distr Ctr v. NLRB

Precedential or Non-Precedential: Precedential

Docket No. 05-3765

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Trafford Distr Ctr v. NLRB" (2007). *2007 Decisions.* Paper 1534.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1534

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 05-3765 and 05-4198
_____

TRAFFORD DISTRIBUTION CENTER,

Petitioner in No. 05-3765

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent
_____

NATIONAL LABOR RELATIONS BOARD,

Petitioner in No. 05-4198

v.

LIBERTY SOURCE W, LLC AND ITS ALTER EGO,
TRAFFORD DISTRIBUTION CENTER,

Respondent

_____


On Petitions for Review and Enforcement of a
Decision and Order of the
National Labor Relations Board
(NLRB Case Nos. 6-CA-33661 and 6-CA-33729)
Administrative Law Judge:   Paul Bogas


_____


Argued on December 4, 2006

BEFORE:   RENDELL, and AMBRO, Circuit Judges,
         and BAYLSON*, District Judge

(Filed February 26, 2007)


_____


   *  Honorable Michael M. Baylson, Judge of the United
      States District Court for the Eastern District of
      Pennsylvania, sitting by designation.

John B. Bechtel    **[ARGUED]**
Sunshine R. Fellows
Bechtel & Lee
925 Liberty Avenue, 2nd Floor
Pittsburgh, PA  15222

*Counsel for Petitioner*
*Trafford Distribution Center*


Aileen A. Armstrong
Fred B. Jacob
National Labor Relations board
1099  14th Street, NW
Washington, DC   20570

Usha Dheenan    **[ARGUED]**
National Labor Relations Board
Contempt Litigation Branch
1099  14th Street, NW, Suite 10700
Washington, DC  20570

*Counsel for Respondent*
*National Labor Relations Board*

———————

OPINION OF THE COURT

———————

3

RENDELL, Circuit Judge.

Before the Court is a petition for review of an decision by the National Labor Relations Board ("NLRB") holding that Trafford Distribution Center ("Trafford") is the alter ego of Liberty Source W, LLC ("Liberty"). Liberty, whose primary business was printing and digital services, also provided a small amount of warehousing services. When Liberty fell on hard times financially, the secured lender took possession of its assets. Thereafter several former employees continued the warehousing business under the auspices of a new entity, Trafford. After Trafford formed, it declared that it would not honor the collective bargaining agreements that existed between Liberty and two unions, the Federation of Independent Salaried Unions ("the Federation") and the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communications Workers of America, Local 601, AFL-CIO ("the IUE"). The unions brought an action before the NLRB based on alleged violations of the National Labor Relations Act ("NLRA").

The Board affirmed the holding of the ALJ that Trafford was the alter ego of Liberty, and that as a result Trafford was bound by the collective bargaining agreements in place between Liberty and the unions. Trafford petitions for review, arguing that the decision by the Board lacked substantial evidence and contained an error of law with regard to the application of the alter ego test. Having reviewed both

4

challenges and found them unavailing, we will affirm the decision of the Board.

## FACTUAL AND PROCEDURAL HISTORY

### A.    Factual History

Liberty was formed by Joseph Wortley in 1998.  It at one time employed 120 people, had sales in excess of $17 million, and was the second-largest printer in the Pittsburgh region.  Liberty had other divisions in addition to its printing division.  It offered "e-source" (i.e. digital) services, including web design and CD-ROM production, in addition to software development.  A small part of its business was also devoted to warehousing ("the warehouse/fulfillment operation").  Customers such as Heinz Co. shipped materials to be held at Liberty's warehouse and Liberty shipped them out as orders and invoices were received.  Roughly 98% of Liberty's business was devoted to printing or e-source services; 1-2% of the business was devoted to warehousing.  Approximately 6 of the 120 people who worked at Liberty at its inception worked in the warehouse operation.  App. 89.

The employees were represented by two unions, the Federation and the IUE.  The salaried employees were represented by the Federation; the IUE represented the hourly workforce.  Beginning in 2002, Liberty began experiencing financial difficulties.  It was unable to repay its debt and

eventually its principal lender, Independence Community Bank ("Bank"), filed a complaint in mortgage foreclosure seeking over $1.8 million from Liberty. Liberty ultimately surrendered all of its assets to the Bank on September 2, 2003.

The next day, September 3, 2003, the managers at Liberty were notified by Liberty President Richard Carmody that the assets had been surrendered, and that Liberty was to halt all operations and send the employees home. The unions did not receive advance notice that Liberty was going to terminate employees and cease operations. Nor were the unions given the opportunity to negotiate over those actions or their effects. Meanwhile, the CFO of Liberty, Patrick Manderfield, advised the Bank that Liberty's value as a going concern was greater than its liquidation value, hoping that the Bank would continue operating Liberty. The Bank declined to do so and chose to liquidate the company. Most of Liberty's assets were auctioned off.

After the surrender of assets, the printing and e-source business quickly disappeared. However, Heinz Co. inquired whether Liberty could keep its inventory at the Trafford, PA facility and resume the fulfillment services there. Joseph Wortley notified Liberty's former management staff that if they could create a viable business comprised solely of warehouse/fulfillment services, he would sell it to them for $1. The staff declined. But they agreed to formulate a business plan for operating a warehouse/fulfillment business.

Sometime later, Barbara Wortley, wife of Joseph Wortley, agreed to back the endeavor with a $25,000 equity investment. She later extended a $17,000 loan to the new entity, Trafford.

Trafford, needing equipment, relied on an appraiser (Graphtek, Inc.) to assess the value of the items in the hands of the Bank that were located at the Trafford, PA site. Trafford ultimately paid the Bank $27,000 for rack shelving, hand trucks, cabinets, office chairs, desks, pictures, and computer equipment. App. 367-68.[1] The Trafford facility resumed operations on September 9, 2003, before Trafford itself was even incorporated. App. 23. Three of Liberty's four managers constituted the management at Trafford. Ten of the twelve Trafford employees were previously employed by Liberty. Nearly all of Trafford's initial customers were former Liberty customers. Liberty's non-warehouse customers did not become customers of Trafford. Trafford also began a new service: leasing out portions of its facility to

---

[1]The ALJ's decision found that the purchase of the equipment was not finalized until May 2004. Additionally, it found that the $27,000 was not to be paid in cash, but was to be deducted from an amount Trafford's employees Leonard Manganello and Pat Manderfield stated the Bank owed them for services rendered. The ALJ stated that the "record does not clarify what services Manganello and Manderfield had rendered to the Bank or why the Bank owed Trafford for space." App. 23.

AGX International.  Trafford's leasing service accounted for less than one percent of Trafford's business.  App. 23.

Shortly after Trafford was created, former Liberty employees Leonard Manganello (former manager of the plant) and Pat Manderfield (former CFO) began hiring Trafford's employees.  The employees were selected without regard to the seniority provisions in Liberty's contracts with the unions.  Trafford established new wage rates, benefit levels, and other conditions of employment.  The unions demanded that Trafford abide by the duties set forth in the collective bargaining agreements to which Liberty was a party.  Trafford refused and the unions filed charges against Liberty and Trafford alleging violations of Sections 8(a)(1) and 8(a)(5) of the NLRA.  Specifically, the unions claimed that Liberty and Trafford were alter egos and that they violated the NLRA by failing to bargain before ceasing operations, terminating the employment of union-represented individuals without bargaining, and setting new wages and terms and conditions of employment for recalled workers.

At the time of the ALJ proceeding, Trafford had a total of twelve employees.  Ten were full-time and two were part-time.  Ten of the twelve were previously employed by Liberty.  App. 24.  Liberty never officially dissolved, nor did it file for bankruptcy.  App. 23.

**B.     Procedural History**

8

The ALJ heard evidence in the case on July 19 and July 20, 2004.  He issued his decision in November 2004.  After describing the factual history, he noted the well-settled principle that employers may not avoid their duties under their employment contracts by "forming what appears to be a new company but is in fact a 'disguised continuance' or alter ego of the old company." App. 25 (quoting *Mar-Kay Cartage*, 277 N.L.R.B. 1335, 1340 (1985)).  The ALJ then described the *Crawford Door* test, *see Crawford Door Sales Co.*, 226 N.L.R.B. 1144 (1976), for finding that two companies are alter egos:

> In order to decide if two facially independent employers are alter egos, the Board considers whether the two entities have substantially identical ownership, management, supervision, business purposes, operation, equipment and premises, and customers.  The Board also looks to whether the purpose behind the creation of the alleged alter ego was legitimate or whether, instead, its purpose was to evade responsibilities under the Act.  No single one among these factors is determinative of alter ego status and not all the indicia need be present for the Board to conclude that a finding of alter ego status is appropriate.

App. 25 (citations and quotations omitted).

The ALJ proceeded to analyze the workings of Liberty and Trafford in light of these enumerated factors.

### 1. Management, Supervision, and Ownership

The ALJ noted that Trafford was wholly owned by Barbara Wortley, wife of Joseph Wortley, the owner of Liberty, and that the circumstances indicated that a true transfer of control did not result from Barbara Wortley's interposition. He noted that Joseph Wortley was the one who initiated discussions about continuing the warehouse/fulfillment operation in some form, and that Joseph Wortley arranged for a bank to provide special financing to Trafford on the basis of (yet unrealized) accounts receivable. The ALJ found that "the totality of the circumstances confirms that the real control of Trafford was with J. Wortley, not his wife. A strong showing of common ownership of Liberty and Trafford has been made." App. 25.

The ALJ concluded that the record established that Liberty and Trafford had substantially identical management and supervision. He noted that three of Liberty's four managers became the management team at Trafford and that their supervisory duties did not change. "Every one of Trafford's managers had been a Liberty manager on September 3," the day Liberty informed its staff it would

10

cease operations.  App. 26.  The ALJ found these facts to constitute a "strong showing" of substantial identity in management.  *Id.*

### 2.  Equipment and Customers

The ALJ concluded that there was substantial identity of equipment and customers.  Trafford used the same premises Liberty had occupied until September 3, 2003; Trafford purchased from the Bank the same exact equipment that Liberty's warehouse had used; all of Trafford's initial customers were Liberty customers; and 98% of Trafford's revenues over the first eight months were from companies formerly doing warehousing business with Liberty.  The ALJ accordingly found that Liberty and Trafford shared substantially identical equipment and customers.

### 3.  Motivation

The ALJ first noted that a showing of improper motive is not necessary to a finding of alter ego status under *A&P Brush Mfg. Corp.*, 323 N.L.R.B. 303 (1997).  The ALJ also considered it "implausible that J. Wortley would sacrifice the printing and e-source operations that constituted over 90 percent of Liberty's business for the purpose of freeing the warehouse/fulfillment operation from its labor law

11

responsibilities." App. 26.[2] But the ALJ did take note of how Trafford came into existence. The ALJ noted that the decision to create Trafford as the vehicle for continuing the business could have been motivated by a desire to avoid the obligations of the collective bargaining agreements.

The ALJ also stated that he had little evidence upon which to base a decision as to the purpose in forming Trafford. Joseph Wortley did not testify, nor did Barbara Wortley or Richard Carmody, the President of Liberty, and the ALJ drew an adverse inference from the failure of the Wortleys to testify.[3] The ALJ noted what he called the "transparent ploy" of designating Barbara Wortley the owner. And he saw evidence of an improper motive in Liberty's failure to inform the union about the decision to suspend Liberty's operations and surrender assets, as well as the failure to bargain over the effects of ceasing Liberty's operations. The ALJ also pointed to the fact that Carmody refused to accept or process labor grievances as the President of Liberty after September 3, 2003. These factors led the ALJ to conclude that "a desire to avoid labor law obligations was a motivation for those actions." App. 27. He noted that it might have been just one of several desires of Liberty and

---

[2]The ALJ added, "As Respondent's counsel suggested during trial, that would not be the tail wagging the dog, but the 'tip of the tail' wagging the dog." App. 26.

[3]No claim was made that they were unavailable.

12

Wortley in continuing Trafford, but it was a legally significant desire all the same. App. 27 n.12.

### 4.      Business Purposes and Operations[4]

The ALJ deemed the question of substantially identical business purposes and operations a closer call. It noted that the warehouse business was a small portion of Liberty's overall portfolio (1-2% of the total). But the entirety of Trafford's business consisted of continuing Liberty's warehouse/fulfillment component. Additionally, Liberty's operation remained complete and functioning during the transition from Liberty to Trafford, "without a significant hiatus." App. 26. "The record shows that on September 8, Trafford simply took over the same work, on the same orders, for all the same customers that Liberty's warehouse/fulfillment operation had serviced until September 3." *Id.*

The ALJ was "given pause" by the fact that Trafford continued only a very small part of Liberty's overall business,

---

[4]The parties, the ALJ, and the Board analyzed "business purposes and operations" as a single factor and given no reason to deviate from that approach, we will do the same. *See NYP Acquisition Corp.*, 332 N.L.R.B. 1041 (2000) (noting that in the usual case, business purpose will be "similar to business operation").

and stated that neither party "has identified any decisions where the Board has considered whether under such circumstances substantial identity of business purpose and operation exists for purposes of the alter ego analysis." App. 26. But the ALJ found roughly analogous precedent in cases involving successorship, where it noted that the Board "found sufficient commonality of ownership where even a small portion of the original company's business is transferred to the new enterprise, but a majority of the new enterprise's employees are from the predecessor's bargaining unit." *Id.* Based on that precedent and the facts available, the ALJ found that Trafford and Liberty had substantially similar business purposes and operations.

The ALJ concluded his analysis by stating that on the basis of these factors, he found that Trafford and Liberty are alter egos. "To sum up, the evidence shows that J. Wortley closed the warehouse\fulfillment business he owned late on a Wednesday, and resumed that warehouse\fulfillment business on the following Monday as a new enterprise at the same location with the same clients, and essentially the same managers, but without recognizing the Unions or applying the existing collective bargaining agreements." App. 27.

In a portion of the ALJ opinion not appealed by Trafford, the ALJ then found that Trafford had violated sections 8(a)(5) and 8(a)(1) of the NLRA. He based his holding on the actions taken by Liberty before, during, and

14

after Liberty's cessation of operations, as well as on the actions taken by Trafford in failing to meet the obligations of Liberty's labor agreements with the unions.

## C.    NLRB Decision

In a July 22, 2005 decision by the NLRB Board (a panel comprised of Chairman Battista and Members Liebman and Schaumber), the Board affirmed the ALJ ruling.  The panel stated that in "agreeing with the [ALJ] that Trafford is an alter ego, Chairman Battista, and Member Schaumber find it unnecessary to pass on the judge's finding that Trafford and Liberty Source had substantially identical business purposes and operations."  App. 16 n.1.  Similarly, the panel stated that in affirming the ALJ's finding as to the purpose behind the creation of Trafford, it was not relying on the adverse inference the ALJ drew from the failure by Trafford to call the Wortleys to testify.  The decision by the panel noted that one of the panel members, Chairman Battista, "adheres to his position that the General Counsel must show, inter alia, an intent to avoid legal obligations under the Act in order to prove alter ego status.  However, recognizing that under extant Board law, unlawful motivation is not a necessary element of alter ego finding . . . Chairman Battista concurs with his colleagues in the finding of alter ego." App. 16.

After affirming that finding and the ALJ's finding that Trafford and Liberty engaged in unfair labor practices, the

15

Board imposed an order designed to remedy the harm caused. This included an obligation to pay terminated employees back pay, reinstate certain employees, and comply with the terms of the collective bargaining agreements.

## PETITION FOR REVIEW

Trafford timely appealed the Board's decision. Trafford's challenge to the Board's decision is confined to the alter ego issue. Specifically, Trafford claims that the alter ego finding lacked substantial evidence, and that the Board committed legal error by failing to consider whether Trafford and Liberty had substantially identical business purposes. Trafford does not attack the findings regarding violations of sections 8(a)(1) and 8(a)(5).

In challenging the alter ego finding, Trafford argues that the companies are not owned by the same individual; that the composition of the Trafford management, though it overlaps with the Liberty management, performs different jobs; that there was no purpose to evade labor law obligations; and that "[m]ost importantly, the character and nature of the two businesses is substantially and materially different." Petr.'s Br. 15. Trafford also argues that the Board failed to apply the proper legal standard when it refused to consider

16

whether Trafford and Liberty had substantially identical business purposes and operations.[5]

## JURISDICTION

The Board had jurisdiction over the case pursuant to Section 10(a) of the NLRA. 29 U.S.C. § § 151, 160(a). We have jurisdiction over the appeal from the Board's decision pursuant to Sections 10(e) and 10(f) of the Act. 29 U.S.C. § 160(e)-(f).

## STANDARD OF REVIEW

The Court reviews the decision of the Board to determine whether there is substantial evidence in the record as a whole supporting the its finding. *Stardyne, Inc. v. NLRB*, 41 F.3d 141, 151 (3d Cir. 1994) ("[W]e must . . . accept the Board's factual determinations and reasonable inferences derived from factual determinations if they are supported by substantial evidence."); *see also Universal Camera Corp. v.*

---

[5]The NLRB filed a cross-application for enforcement of the Board's order. With respect to Liberty, the NLRB claims that the Board is entitled to summary enforcement against Liberty because it failed to file an answer to the complaint, appear at the Board hearing, file exceptions to the ALJ decision, or file an answer or brief with the Third Circuit. We will grant enforcement, as noted below.

*NLRB*, 340 U.S. 474 (1951). "Where the Board adopts the ALJ's findings of fact and conclusions of law, it is the ALJ's determinations that we review." *SCA Tissue N. Am. LLC v. NLRB*, 371 F.3d 983, 988 (7th Cir. 2004). Where the Board has adopted the ALJ's decision in part, the Court reviews both. *See NLRB v. Greensburg Coca-Cola Bottling Co.*, 40 F.3d 669, 670 (3d Cir. 1994).

## DISCUSSION

Trafford acknowledges that the key factors in an alter ego analysis are whether the two organizations have substantially identical "management, business purpose, operation, equipment, customers and supervision, as well as ownership." *Crawford Door Sales Co.*, 226 N.L.R.B. 1144, 1144 (1976). Our decision in *Stardyne, Inc. v. NLRB*, 41 F.3d 141 (3d Cir. 1994), noted that "[t]he Board does not require the presence of each factor to conclude that alter ego status should be applied." *Id.* at 146. We conclude that the relevant factors, taken in the aggregate, weigh against Trafford.[6]

---

[6]Trafford argues that both the ALJ and the Board failed to recognize and evaluate an additional "important factor," the negotiations and formalities surrounding the transactions creating the new entity, and that as a result, the alter ego finding is not supported by substantial evidence. Petr.'s Br. 24. While the NLRB has on occasion considered negotiations and formalities when weighing alter ego, *see, e.g.*, *United Bhd. of Carpenters and Joiners of Am., Local No. 745*, 312

### A. Management, Supervision, and Ownership

Trafford acknowledges that substantially identical ownership may be found where two enterprises are owned by members of the same family. It also acknowledges that the management and ownership of Trafford is "similar to that of Liberty." Petr.'s Br. 27. But Trafford argues that this is "insufficient by itself to support an alter ego finding," *id.*, which is essentially an irrelevant point because the Board did not rely solely on the management and ownership of Trafford. The role of Mrs. Wortley as owner weighs against Trafford.

The ALJ held that "most of the management team that ran Liberty became managers of Trafford, and every one of Trafford's managers had been a Liberty manager on September 3. This constitutes a strong showing of substantial identity in management." App. 26. Trafford claims that the Board failed to consider substantial evidence indicating that the tasks performed by its managers are different from those performed when they were at Liberty. The thrust of this claim is that Trafford is a small "mom and pop business" where

---

N.L.R.B. 903, 909 (1993); *A-1 Schmidlin Plumbing & Heating Co.*, 284 N.L.R.B. 1506, 1513 (1987), it is not a required factor in the alter ego framework. Moreover, in this case the overwhelming weight of the factors articulated by the NLRB in *Crawford Door*, *supra*, supports the result reached by the Board.

19

managers also work in the warehouse area shipping the materials, and that even if the managers are the same and bear the same titles, they should be considered different from Liberty because their tasks are different.  The task distinctions did not alter the supervisory duties of the managers, nor does Trafford cite to any case where the NLRB or a court found that the management–despite being composed of the same management personnel–was different for alter ego purposes due to changes in tasks performed.  The management and supervision factors weigh against Trafford.

## B.      Equipment and Customers

Trafford points to the differences between its business and the printing and e-source services Liberty performed in an attempt to draw a distinction between Trafford and Liberty's customers and equipment.  It also attempts to ignore the fact that the equipment used in running Trafford's warehouse/fulfillment business and Liberty's warehouse/fulfillment business is not only substantially identical but in many cases is the *very same equipment*. Trafford's current business is run with the equipment purchased from the Bank that Liberty had turned over as its assets (equipment which never left the Trafford site and was purchased by Trafford).   There was also evidence that Trafford did not pay for the equipment for many months, as well as evidence that Trafford did not have to pay rent to lease

the premises for several months. This evidence weighs against Trafford's contentions.

Trafford also takes issue with the portion of the Board's decision in which it "erroneously assumed that the relevant time frame for comparing Liberty and Trafford's respective customers is limited to the days immediately following Liberty's closure and Trafford's start up." Petr.'s Br. 23. Trafford believes that it is more appropriate to focus on the "entire period following Trafford's creation." *Id.* However, it presents no evidence indicating that this broader period would be different. Nor does Trafford dispute the ALJ's finding that 98% of Trafford's customers were formerly Liberty customers, and that Trafford's new venture (which differed from Liberty's warehousing business model) comprised less than one percent of its revenues. App. 23. The NLRB aptly notes that "Trafford never moved to supplement the record with evidence showing that its customer base had changed substantially since the hearing." Respondent's Br. 22. The factors of equipment and customers weigh against Trafford.

## C.    Motivation

Trafford contends that there is no evidence that Trafford was formed with anti-union purpose. "Trafford was not created as a disguise. It was not formed to evade any labor obligations." Petr.'s Br. 25. Trafford claims that the

21

"fact that Liberty was irrefutably in default at the time that it ceased operations and turned over its assets to the Bank" also weighs against a finding of alter ego. None of these facts suggest that the ALJ's decision lacked substantial evidence. Trafford also argues that the factor of motivation is a "critical variable" under *NLRB v. Omnitest Inspection Services, Inc.*, 937 F.2d 112 (3d Cir. 1991), and that "the Board's unwillingness to even consider this factor strongly suggests that its findings are not supported by substantial evidence." Petr.'s Br. 27. In fact, it is clear that the Board did affirm the finding as to improper motivation. The only aspect of the ALJ's decision as to motivation that the Board rejected was the inference drawn from the lack of testimony by the Wortleys. This factor weighs against Trafford, if only slightly.

### D.  Business Purposes and Operations

The business purposes and operations factor is one which gives us pause, as it did the ALJ and the Board. Trafford calls the Board's "most glaring error" the Board's failure to "recognize the undeniable fact that the business purpose of Trafford is separate of that of Liberty. Liberty was a printing operation. Trafford is a warehousing company. Trafford does no printing." Petr.'s Br. 20. Trafford cites to our decision in *Stardyne, Inc., v. NLRB*, 41 F.3d 141 (3d Cir. 1994) for its statement that the "main focus of the inquiry is to determine whether the two employers are the same business in

22

the same market," *id.* at 151,[7] and Trafford's claim boils down to the assertion that because Trafford bears a resemblance only to a tiny portion of Liberty's overall business portfolio, Trafford is not "the same business in the same market." Therefore, Trafford contends, it cannot be considered Liberty's alter ego.

The Board found that substantial evidence supported the finding that Trafford and Liberty are alter egos even without taking into consideration the ALJ's finding that the two entities have substantially identical business purposes. App. 16. Under the alter ego jurisprudence, "[t]he Board does not require the presence of each factor to conclude that alter ego status should be applied." *Stardyne*, 41 F.3d at 146. Accordingly, the Board's finding did not need to rely on this factor, nor would it mean victory for Trafford had this factor

---

[7]The Board has in prior cases described this factor as referring to whether the two entities "shared substantially the same business purpose *in whole or in part*." *Metro. Teletronics Corp.*, 303 N.L.R.B. 793, 798 (1991) (emphasis added); *see also Better Bldg. Supply Corp.*, 283 N.L.R.B. 93, 95 (1987) ("[A] reduction in the scope of operations has . . . been held ineffective [to deem the businesses legally distinct], (i.e., when the alter ego conducts far less business, a portion of the former business, serves a smaller market, etc.).") (footnote omitted); *William B. Allen*, 267 N.L.R.B. 700, 705 (1983) (standard is "whether the 'new' business is substantially the same, in whole or in part").

been decided in Trafford's favor.  Thus, Trafford faces the burden of showing that by deeming it  "unnecessary to pass on" the ALJ's business purposes finding, the Board's decision lacks substantial evidence.[8]

The very cases Trafford cites for support of its argument that, by not "pass[ing] on" the business purpose question, the Board lacked substantial evidence, undercut that argument.  As we stated in *Stardyne* and the NLRB stated in *Sobeck Corp. & Roof Pro, Inc.,* the presence of each alter ego factor is not necessary to conclude that an alter ego relationship exists.  *See Stardyne*, 41 F.3d at 146 ("The Board does not require the presence of each factor to conclude that alter ego status should be applied."); *Sobeck Corp. & Roof Pro, Inc*, 321 N.L.R.B. 259, 266 (1996) ("Roof Pro and Sobeck Corp. share six of the seven criteria delineated . . . .").

----

[8]The Board stated that "[i]n agreeing with the judge that Trafford is an alter ego, Chairman Battista and Member Schaumber find it unnecessary to pass on the judge's finding that Trafford and Liberty Source had substantially identical business purposes and operations."  App. 16.  We take this to mean that the holding by the Board neither affirms nor rejects the finding by the ALJ on that factor.  The Board used more specific language when it stated that it "did not rely on the adverse inference the judge drew from the failure of the Respondents to call" the Wortleys to testify.  *Id.* Accordingly, we read the Board as neither rejecting nor affirming the business purpose finding.

24

Even if the Board's decision rejected the identical business purpose finding by the ALJ (and it is not clear that it did, *see* n.8 *supra*), the evidence regarding ownership control, motive, equipment, customers, the facts of the transition period, and the composition of management personnel were sufficient in the Board's eyes to support the alter ego finding. Trafford cites to no precedent that holds that a specific finding as to business purposes is essential to the alter ego finding; indeed, *Stardyne* explicitly says that the presence of each factor is not necessary. *Stardyne*, 41 F.3d at 146.

Our canvass of NLRB decisions involving partially reconstituted businesses has uncovered cases where alter ego was found to be present despite a significant change in scope of the business. *See, e.g., NLRB v. Scott Printing Corp.*, 612 F.2d 783 (3d Cir. 1979); *Metro. Teletronics Corp.*, 303 N.L.R.B. 793 (1991); *Better Bldg. Supply Corp.*, 283 N.L.R.B. 93, 94 (1987); *William B. Allen*, 267 N.L.R.B. 700 (1983); *Custom Mfg. Co.*, 259 N.L.R.B. 614 (1981). We do acknowledge that we have found no case with facts as stark as these. Nevertheless, we agree with the Board and the ALJ that there is substantial evidence for the alter ego finding in light of analysis as to the other factors: the similarity in customers, managers, equipment, and warehouse location; the brevity of the transition period; and the anti-union inferences. While on a different set of facts an entity with such a minimal overlap in business purposes might appropriately be deemed outside the definition of alter ego, on these facts, where all the

25

remaining alter ego factors point in a single direction, we have no difficulty affirming the Board's decision.

The Board has never used a bright-line test to quantify and assess the amount of business overlap. Instead it has looked to the facts on a case-by-case basis and balanced business purposes together with evidence of other similarities between the companies. The Board has latitude under *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984), to adopt a test for alter ego, *see Stardyne*, 41 F.3d at 147-49 (finding the Board's alter ego test–which lacks a requirement of proof of anti-union intent–to be a reasonable interpretation of the NLRA under *Chevron*), and Trafford has not argued that the test is inconsistent with the NLRA under *Chevron*. Thus, we conclude that the Board's application of existing law to the facts of this case was supported by substantial evidence.

**CONCLUSION**

The decisions by the ALJ and the Board are supported by substantial evidence and the petition for review will be DENIED.

The NLRB has requested summary enforcement against Liberty in light of the fact that Liberty did not file an answer to the complaint, appear at the Board hearing, file exceptions to the ALJ decision, or appeal its decision. Under Rule 15(b)(2) of the Federal Rules of Appellate Procedure,

26

"[w]ithin 20 days after the application for enforcement is filed, the respondent must serve on the applicant an answer to the application and file it with the clerk." Fed. R. App. P. 15(b)(2). There is no indication that Liberty answered the NLRB's cross-petition for enforcement of the Board's order, and on that basis the petition for enforcement will be GRANTED.

_____