### NATIONAL LABOR RELATIONS BOARD
v.
### CONCRETE HAULERS, Inc. et al.
### No. 14824.

United States Court of Appeals
Fifth Circuit.
May 6, 1954.

478

A. Norman Somers, Asst. Gen. Counsel, N.L.R.B., David P. Findling, Assoc. Gen. Counsel, N.L.R.B., Elizabeth W. Weston, Atty., N.L.R.B., Washington, D. C., George J. Bott, General Counsel, Frederick U. Reel, John Francis Lawless, Attorneys, N.L.R.B., Washington, D. C., for petitioner.

Stanley E. Neely, Eugene M. Locke and Locke, Locke & Purnell, Dallas, Tex., for respondents.

Before HUTCHESON, Chief Judge, and HOLMES and BORAH, Circuit Judges.

HOLMES, Circuit Judge.

This is a petition to enforce an order of the National Labor Relations Board, requiring the respondents to cease and desist from refusing to bargain with the union,[1] and from interfering with, restraining, and coercing its employees in the exercise of their organizational rights. The respondents, Concrete Haulers, Inc., and Wamix, Inc., are engaged in the manufacture and delivery of concrete within the state of Texas, their principal office being in Dallas. The Board obtained jurisdiction over respondents in 1951, when the latter made sales to companies engaged in interstate commerce. The two respondents have the same president, vice-president, and secretary-treasurer; Mr. Thomas Amis, the president, is the majority stockholder and the labor relations director of both corporations. Respondent Wamix is engaged in the manufacture and sale of prepared concrete, and prior to the formation of Concrete Haulers, made delivery in its own trucks. In March, 1951, Concrete Haulers was incorporated for the sole purpose of transporting the concrete sold by Wamix and another company, Red-D-Mix, Inc., which is also controlled and managed by the Amis family. The trucks owned by Wamix and Red-D-Mix were then transferred to Concrete Haulers, and all of the drivers were placed on the latter's payroll. While the respondents were so operating, the alleged unfair labor practices occurred. After one year, on March 31, 1952, the drivers and their trucks were re-transferred to the production corporations, and Concrete Haulers became

1. Dallas General Drivers, Warehousemen and Helpers, Local Union No. 745, AFL.

a non-operative but undissolved corporate entity.

On May 25, 1951, eight of Concrete Haulers' 14 truck drivers and one dispatcher signed union cards, after which the union representative called on respondents' president, offered to prove the union's representation of said truck drivers, and requested that respondents enter into negotiations with the union for a contract. At the above meeting and also at one held on June 6, 1951, Amis impliedly recognized the union as being the representative of the truck drivers, but stated that he would not sign a contract because his attorney had advised that to do so would be illegal. On the morning of June 7, 1951, Amis made a speech to his truck drivers, in which he told them that he did not recognize the union, and would not sign a contract because the state law did not require it; that he was not convinced of the fact that the union represented a majority of the employees in an appropriate unit; and that he would like for the drivers to continue to work under the same conditions that existed before the union entered the picture. Immediately following the president's speech, the union was advised of respondent's refusal to bargain, and on the same day the union representative again demanded a contract, which Amis refused for the reason previously given. All eight of the truck drivers holding union cards then left the plant, and that afternoon a picket line was established. On June 8, 1951, respondents notified each striking employee by letter that he would be replaced if he did not return to work.

The board found that the union represented a majority of respondents' truck drivers in an appropriate bargaining unit, and rejected respondents' contention that they in good faith had entertained a doubt as to the union's claim of majority representation, since, at neither the May 26th nor the June 6th meeting with the union did respondents question the union's majority status or avail themselves of the union's offer to prove its majority. The board thereby held that, by refusing to bargain with the union on June 6th and thereafter, the respondents had violated Section 8 (a)(5) of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. The board also found that, since the drivers had gone on strike because of respondents' refusal to bargain, the strike was an unfair-labor-practice strike. The board characterized respondents' letter of June 8th as threatening the strikers with loss of their jobs unless they abandoned their strike, and concluded that respondents had thereby interfered with, restrained, and coerced their employees, in violation of Section 8(a)(1) of the Act. Finally, the board found that the respondents had also violated Section 8(a)(1) by interrogating two employees concerning their membership in the union. The order of the board directed the respondents to offer reinstatement, upon application, to those strikers who had not already been reinstated, and to make them whole for any loss of pay, if any, they might suffer before being reinstated. The order also required the respondents to bargain with the union upon request.

■■ The evidence is clear that the two respondents constitute one employer within the meaning of the National Labor Relations Act. Where, in fact, the production and the distribution are one enterprise, that enterprise as a whole is responsible for compliance with the Act, regardless of the corporate arrangement of the parties between themselves. The interdependence and integrated nature of the operations of the respondents, the common ownership of stock, and the fact that the same officer administers a common labor policy, clearly indicate that there is only one employer for the purposes of this Act. N. L. R. B. v. Condenser Corporation, 3 Cir., 128 F.2d 67.

■ The evidence shows that the union represented a majority of respondents' truck drivers. The request to bargain was not ambiguous because, on each occasion, the union representative informed respondents that the union represented a majority of respondents' truck

drivers, and offered to prove this representation. The president of respondents, in his speech prior to the strike, specifically referred to the drivers as being union members; and it is apparent that respondents were aware of the existence of the unit that had been designated by the union. Since the strike was the result of respondents' unlawful refusal to bargain, it was clearly an unfair-labor-practice strike, and the respondents were under a duty to reinstate all striking employees.

We think there was substantial evidence in the record, considered as a whole, to support the findings of the board; and the petition for enforcement is granted.

Enforced.