**MANLEY TRANSFER COMPANY, Inc. and Kansas Delivery Service, Inc., Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 18864.

United States Court of Appeals
Eighth Circuit.

March 14, 1968.

W. C. Dannevik, Jr., Kansas City, Mo., for petitioners; Donald J. Quinn, Kansas City, Mo., was with W. C. Dannevik Jr., Kansas City, Mo., on the brief and reply brief.

Paul J. Spielberg, Atty., N.L.R.B., Washington, D. C., for respondent; Arnold Ordman, Gen. Counsel, N.L.R.B., Dominick L. Manoli, Associate Gen. Counsel, N.L.R.B. Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., and Glen M. Bendixsen and Marion Griffin, Attys., N.L.R.B. were on the brief.

Before BLACKMUN, GIBSON and HEANEY, Circuit Judges.

HEANEY, Circuit Judge.

The petitioners request this Court to review and set aside a decision and order of the National Labor Relations Board, reported at 164 NLRB 21, 1967, 65 LRRM 1194. The Board cross petitions for enforcement. This Court has jurisdiction under Section 10(e) and (f) of the National Labor Relations Act. 29 U.S.C. § 160(e), (f) (1964 ed.).

We have reviewed the Board's findings of the fact in the light of established standards. Universal Camera Corp. v. National L. R. Bd., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); N.L.R.B. v. Superior Sales, Inc., 366 F.2d 229 (8th Cir. 1966). We have resolved fairly conflicting views in accordance with the Board's findings, N.L.R.B. v. Coachman's Inn, 357 F.2d 134 (8th Cir. 1966); N.L.R.B. v. Morrison Cafeteria Co. of Little Rock, Inc., 311 F.2d 534 (8th Cir. 1963), and have accepted as reasonable the inferences drawn by the Board as we believe them to be adequately supported by the record. N.L.R.B. v. Melrose Processing Co., 351 F.2d 693 (8th Cir. 1965); Kitty Clover, Inc. v. National Labor Relations Board, 208 F.2d 212 (8th Cir. 1953).

Applying the above standards, we accept the Board's findings of fact which were substantially as follows:

Manley Transfer is a Kansas corporation operating a trucking business as a common carrier in interstate commerce. It is a family-owned corporation. The stock is equally divided among three brothers and one sister, all of whom are directors of the Company. It maintains freight terminals in the towns it serves. In the smaller towns, as a matter of policy, it tries to have agents operate the terminals, rather than having Company-owned stations. The agency contracts are standard with minor variations as to the commissions paid to the agents.

Manley Transfer had an agent's contract with the George Harris Delivery Service in Lawrence, Kansas, from 1959 to 1964. Harris developed financial difficulties in 1964. He went to Lawrence Manley, the General Manager of Manley Transfer, for help. They reached an agreement that a new corporation would be organized to operate the terminal in Lawrence, that Lawrence Manley would advance money to it, and that Harris would remain its General Manager. Pursuant to the agreement, Lawrence Manley co-signed a personal note to take care of Harris' obligations, and a corporation, "Kansas Delivery Service, Inc.," (Kansas Delivery) was organized. Ten shares of common stock were issued at a par value of $100.00 each. Lawrence Manley and his wife subscribed to nine shares, paying for them with personal funds, and George Harris to one. Lawrence Manley was elected President; his wife, Secretary-Treasurer; and George Harris the General Manager. The three formed the Board of Directors.

As General Manager, Harris received a salary, plus a commission based on a percentage of profits.

Kansas Delivery signed an agent's contract with Manley Transfer to operate the Lawrence terminal. The terms of the contract were similar to those in the previous agreement between Harris and Manley Transfer. Kansas Delivery continued to operate as Harris had, employing the same persons at the same location, using the same equipment and

having the same supervision, i. e., George Harris. Hiring and firing, with exceptions subsequently noted, was left in Harris' hands, but the employees were informed that they had a new boss "Larry Manley." Employees were not transferred between Kansas Delivery and Manley Transfer. Manley Transfer's freight bills were used. The Manley Transfer I.C.C. permit was used in interestate operations. Lawrence Manley kept the books, signed all checks and prepared and submitted various governmental reports for Kansas Delivery. The bulk of Kansas Delivery's business continued to be the hauling of "Hallmark" cards. The signs on the terminal identified it as a Manley terminal; employees were instructed to answer the telephone by saying, "Manley Transfer Company;" the trucks had Manley Transfer colors and name on them; they pulled Manley Transfer trucks and Manley Transfer paid the cost of carrying insurance for the new company. The contract was terminable by either party on fifteen days notice.

In early February, 1966, Foster, an employee of Kansas Delivery, contacted the Vice President of Local 41 of the International Brotherhood of Teamsters and asked about getting a Union. The Union representative told Foster that he would send him Union cards, that Foster should have the cards signed and return them to the Union. By February 16, 1966, Foster had secured the signatures of a majority of the employees on the cards, namely, Melvin Beerbower, Gerald Cobb and Dean Howard, and had returned them, along with one signed by himself, to the Union.

On March 10th, a Vice President of the Union told Lawrence Manley that the men at Lawrence, Kansas, had authorized the Union to represent them. He requested recognition and asked that a contract be negotiated. Lawrence Manley told him that before this transpired he would close the operation. Later the same day, Harris told Foster that Lawrence Manley had called him from Kansas City and had told him that four

Union employees had signed cards, and that he wanted the instigators fired. Foster admitted securing the signatures but stated that he could not be fired for such action. Harris immediately discharged Foster telling him that he had complaints about Foster from the "Hallmark Company" and that he could fire him for the complaints. A few hours later, Harris questioned Beerbower, Cobb and Howard with respect to their Union activities, threatened them with discharge if they did not abandon their Union activities, and offered them a wage increase if they would forget about the Union.

Foster reported his discharge to the Union and the Union attempted, without success, to secure his reinstatement. On March 16th, Foster returned to the company to pick up some clothing and was asked by Harris if he was going to keep pushing the Union. When he stated that he was, Harris answered, "I will tell you one thing. Before I have a Union, I will lock the doors."

Between March 14th and March 26th, a number of discussions relating to a contract and the reinstatement of Foster were held between the Union, Lawrence Manley and his attorneys. Lawrence Manley insisted that Manley Transfer was in the middle, that it had nothing to do with Kansas Delivery, and that the Union would have to negotiate with George Harris.

Meanwhile, on March 17th, Lawrence Manley talked to Raymond Brooks of the Brooks Transfer and Storage Company about the possibility of his taking over the Lawrence operation, along with one at Ottawa, Kansas. On March 22nd, Lawrence Manley signed a new contract for Manley Transfer with Brooks for the operation of the Lawrence terminal, effective March 26, 1966. The contract was substantially the same as the one with Kansas Delivery, except that it provided for lower commissions.

After the contract was signed, Lawrence Manley told George Harris what had taken place and instructed him to send Manley Transfer a letter requesting

cancellation of the agreement between it and Kansas Delivery. George Harris did so on the same date. Manley Transfer cancelled the agreement on receipt of the notice.

On March 26th, Harris informed Beerbower, Cobb and Howard that he was going to close the doors, that they were out of jobs, and that he, too, was no longer employed.

On March 28th, Brooks commenced operations as Manley Transfer's, Lawrence, Kansas, agent, using substantially the same equipment and operating about as before. A lease was negotiated for the use of the equipment of Kansas. George Harris was employed as a driver and Mrs. Harris as an office worker. Neither Foster, Beerbower, Cobb nor Howard were employed, their places being filled by two employees from the Brooks' Ottawa operation and two newly hired employees from Ottawa.

The Board concluded: (1) that Manley Transfer's control of Kansas Delivery was such as to constitute Kansas Delivery a subordinate instrumentality of it, and Kansas Delivery's supervision and employees were, in effect, part of Manley Transfer's supervision and work force; (2) that Manley Transfer and Kansas Delivery violated Section 8(a) (1) and (3) of the Act by interrogating the employees about their Union activities, threatening them with discharge if they did not abandon them, offering a wage increase if they would forget about the Union and discharging Foster because of his Union activities; (3) that Manley Transfer and Kansas Delivery violated Section 8(a) (1) of the Act by threatening Foster that the terminal in Lawrence, Kansas, would be closed to prevent unionization, and promising Foster a job in Kansas City, Missouri, if he would forget about the Union; (4) that Manley Transfer and Kansas Delivery, by their failure to recognize the Union, the cessation of business by Kansas Delivery on March 26, 1966, and the substitution of Brooks for the operation of the Lawrence, Kansas, terminal engaged in a course of conduct whereby they clearly refused to bargain in good faith with the Union in violation of Section 8(a) (5) and (1) of the Act; and (5) that Manley Transfer and Kansas Delivery violated Section 8(a) (3) and (1) of the Act by discriminatorily terminating Cobb, Howard and Beerbower.

The Board ordered Manley and Kansas to restore the *status quo* by terminating their contract and lease agreement with Brooks, taking over the operation of the Lawrence, Kansas, business, offering reinstatement and back pay to Foster, Beerbower, Cobb and Howard, and bargaining collectively with the Union. It required the usual notices to be posted.

The petitioners do not question the Board's findings that Kansas Delivery violated the Act by interrogating, threatening and making promises to the employees, or that Kansas Delivery violated the Act by discharging Foster. They contend, however: (1) that the Board's finding that Kansas Delivery was a subordinate instrumentality of Manley Transfer, and that its supervision and employees were in fact a part of Manley Transfer's supervision and work force, and thus responsible with Kansas Delivery for the unfair labor acts, are arbitrary and not supported by substantial evidence; (2) that the cessation of operations by Kansas Delivery constituted a complete and permanent going out of business, and was thus privileged even if motivated by anti-Union considerations; and (3) that the Board acted beyond the scope of its authority in ordering the termination of the new lease agreement with Brooks at Lawrence, Kansas.

We will consider these objections *seriatim:*

■■ (1) We have reviewed the record carefully and believe that the Board's findings and conclusions as to the relationship between Manley Transfer and Kansas Delivery are proper. Lawrence Manley was primarily responsible for the establishment of Kansas Delivery; he effectively controlled it and did so

as a representative of Manley Transfer and not as an individual; he caused Foster to be discharged for his Union activities; he negotiated the agreement with Brooks; and he caused the contract between Manley Transfer and Kansas Delivery to be terminated. Under such circumstances, the Board properly concluded that Manley Transfer was equally responsible with Kansas for the unfair labor practices and that it was equally obligated to undo the effects of such practices. National Labor Relations Board v. National Garment Co., 166 F.2d 233 (8th Cir.), cert. denied, 334 U.S. 845, 68 S.Ct. 1513, 92 L.Ed. 1768 (1948); National Labor Relations Board v. Long Lake L. Co., 138 F.2d 363 (9th Cir. 1943).[1] Cf., National Labor Relations Board v. A. E. Nettleton Co., 241 F.2d 130 (2d Cir. 1957); A. M. Andrews Co. of Oregon v. National Labor Rel. Bd., 236 F.2d 44 (9th Cir. 1956); National Labor Relations Bd. v. New Madrid Mfg. Co., 215 F.2d 908, 914 (8th Cir. 1954); National Labor Relations Bd. v. Concrete Haulers Inc., 212 F.2d 477 (5th Cir. 1954); National Labor Relations Board v. Gluek Brewing Co., 144 F.2d 847 (8th Cir. 1944).

The petitioners rely on Continental Bus Systems, Inc. v. N.L.R.B., 325 F.2d 267 (10th Cir. 1963), to support their position that Kansas Delivery was an independent contractor and that Manley Transfer was, therefore, not responsible for the unfair labor practices.

We do not agree. The facts in *Continental* are clearly distinguishable. In *Continental*, the contract between it and the operator was for a six-month initial period and for successive periods of six months thereafter. Here, Manley Transfer reserved the right to cancel the contract with Kansas Delivery on a fifteen-day notice. In *Continental*, the operator prepared Social Security reports, withheld necessary taxes, and signed payroll and other expense checks. Here, Manley Transfer performed all of these duties for Kansas Delivery. In *Continental*, the operator exercised complete control over the hiring and firing of his employees. Here, Manley Transfer dictated the discharge of Foster and effectively arranged for the discharge of three other employees.

(2) The termination of the operations of Kansas Delivery at Lawrence, Kansas, by Manley Transfer was motivated by anti-Union considerations and did not constitute a complete and permanent going out of business by Manley Transfer. It was not, therefore, privileged under Textile Workers Union of America v. Darlington Mfg. Co., 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965). Brooks is doing the same work at the same location, with much of the same equipment, and using the same supervisory staff as Kansas Delivery. There is no evidence to indicate that Manley Transfer contracted the work out for valid economic reasons. Com-

1. In *Long Lake*, a logger had a contract with the Long Lake Company for the logging of standing timber owned by the Company at Sandpoint, Idaho. His contract was terminable on thirty days' notice, and his pay rolls and other operating expenses were financed by Long Lake. The Woodworkers Union commenced an organizational campaign, after which Long Lake intervened and took over direction of the anti-Union activities in much the same manner as Manley Transfer did here. The Court stated:

"* * * [T]he showing manifests an attitude of hostility on the part of Long Lake toward the unionization of the logging camp by Woodworkers and that the evidence is indicative as well of a measure of domination by Long Lake incon-

sistent with the notion that Robinson was really a free agent either in handling the enterprise or in dealing with the men employed. * * *

"We think the record warranted the Board's treatment of Robinson and the Long Lake Company as joint employers. Cf. N.L.R.B. v. Grower-Shipper Vegetable Ass'n, etc., 9 Cir., 122 F.2d 368, 377 * * *. More particularly is the treatment appropriate since the term 'employer' is defined in § 2 of the Act as including 'any person acting in the interest of an employer, directly or indirectly * * *.' * * * *"

National Labor Relations Board v. Long Lake L. Co., 138 F.2d 363, 364 (9th Cir. 1943).

pare, National Labor Relations Board v. Adams Dairy, Inc., 350 F.2d 108 (8th Cir. 1965), cert. denied, 382 U.S. 1011, 86 S.Ct. 619, 15 L.Ed.2d 526 (1965); N.L.R.B. v. William J. Burns Internat'l Detective Agency, Inc., 346 F.2d 897, 901 (8th Cir. 1965); N.L.R.B. v. Transmarine Navigation Corporation, 380 F.2d 933 (9th Cir. 1967). The action of Manley Transfer in this case is analogous to the closing of a department and contracting out the work of that department to an independent contractor—a type of action recognized in *Darlington* as being violative of Section 8(a)(3) of the Act if motivated by anti-Union sentiment. Textile Workers v. Darlington Mfg. Co., supra, 380 U.S. n. 16 at 272, 85 S.Ct. 994, 13 L.Ed.2d 827. See also, Town & Country Manufacturing Company v. N.L.R.B., 316 F.2d 846 (5th Cir. 1963); N.L.R.B. v. Brown-Dunkin Company, 287 F.2d 17 (10th Cir. 1961).

Had this Court accepted the petitioners argument that Manley Transfer was not, in fact, the controlling voice in Kansas Delivery, we would admittedly have a different question. Having rejected that contention, however, the petitioners argument falls.

 (3) The Board's order directing the petitioners to terminate their contract and lease agreement with Brooks at Lawrence, Kansas, to resume the operation of the terminal there and to offer the discharged employees reinstatement with back pay is within the power of the Board under Section 10(c) of the Act.

The Board's power with respect to remedies is a broad discretionary one and is peculiarily a matter for administrative competence. Fibreboard Paper Products Corp. v. National Labor Relations Board, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964); National L. R. B. v. Seven-Up Bottling Co., 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377 (1953); Phelps Dodge Corp. v. National Labor Rel.Bd., 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941). The Board's order will do nothing more than restore the parties to the situation that existed prior to the commission of the unfair labor practices. Compare, N.L.R.B. v. American Manufacturing Company of Texas, 351 F.2d 74, 80 (5th Cir. 1965). There is no showing that this will place an unfair burden on the petitioners. Compare, National Labor Relations Bd. v. Missouri Transit Co., 250 F.2d 261, 264 (8th Cir. 1957); Williams Motor Co. v. National Labor Relations Board, 128 F.2d 960, 966 (8th Cir. 1942).

The Board's order is carefully tailored. When the petitioners have complied with its terms, they will have available to them every legitimate alternative that they had before they instituted their course of illegal conduct. See, Fibreboard Products Corp. v. National Labor Relations Board, supra, 379 U.S. at 215–217, 85 S.Ct. 398, 13 L.Ed.2d 233.

We have examined the other contentions of the petitioners and find them to be without merit.

Enforcement of the order under review is granted.