**WOODLINE MOTOR FREIGHT, INC. Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 86–1631.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 3, 1987.

Decided March 31, 1988.

Rehearing and Rehearing En Banc Denied June 13, 1988.

---

Russell Gunter, Little Rock, Ark., for petitioner.

Patrick Szymanski, Washington, D.C., for respondent.

Before HEANEY and WOLLMAN Circuit Judges, and ROSS, Senior Circuit Judge.

HEANEY, Circuit Judge.

Woodline Motor Freight, Inc., petitions this Court to review an order of the National Labor Relations Board. That order found Woodline committed a series of unfair labor practices and required Woodline to cease and desist from further specified unfair labor practices and to take certain affirmative action to effectuate the policies of the National Labor Relations Act, 29 U.S.C. §§ 151–69. The Board cross-petitions for enforcement of its order. With the exceptions noted in this opinion, we hold that there is substantial evidence in the record as a whole to support the Board's findings, and we thus enforce the Board's order.

Woodline does not come to this Court with a clean record. It has twice been held to have violated the National Labor Relations Act, 29 U.S.C. §§ 151–69. In 1977, the Board found that Woodline had committed serious unfair labor practices. *Woodline, Inc.*, 231 N.L.R.B. 863, 97 L.R.R.M. 1288 (1977), *enforced*, 577 F.2d 463 (8th Cir.1978). In the same year, the Board also found that Woodline violated the National Labor Relations Act, 29 U.S.C. §§ 151–69, by threatening its employees during an election. *Woodline, Inc.*, 233 N.L.R.B. 97, 97 L.R.R.M. 1217 (1977). No request for review of this decision was made.

In this proceeding, Woodline asks this Court to review only limited portions of the Board's order. Woodline does not challenge the Board's findings that it violated section 8(a)(1) of the Act, 29 U.S.C. § 158 (a)(1), by coercively interrogating employees about union activities, by threatening employees who supported the union, by creating the impression that the employees' union activities were under surveillance, and by promising employees additional benefits if they abandoned their support for the union. Nor does Woodline challenge the Board's findings that it violated sections 8(a)(1) and (3) of the Act, 29 U.S.C. §§ 158(a)(1) and (3), by reducing the work week; by laying off Russellville line drivers Kenneth Lloyd, Wesley Clayton, Opie Whitbey, C.L. Dawson, and Charles Churchill; by reducing the work available to Ted Sweden; by constructively discharging Wilford Lanthorn; by reducing the work available to remaining Russellville line drivers after March, 1981; and by discharging Leonard Hogan. The Board found that Woodline took these actions because these employees engaged in union activities. We find substantial evidence in the record to support these uncontested findings. We, therefore, summarily enforce the uncontested portions of the remedial order. *See Montgomery Ward & Co. v. NLRB*, 385 F.2d 760, 765 (8th Cir.1967).

We turn to the contested violations:

(1) *The Discharge of Paul Rickman*

■ We find substantial evidence to support the Board's finding that Paul Rickman was discharged in violation of section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1).

Rickman asked Woodline in June, 1980, to install air conditioners in the trucks. Woodline refused. Rickman proposed to the other drivers that he would install an "add-on" unit on his truck and, if it worked, the other drivers could do the same. The drivers authorized Rickman to present the idea to the management. The proposal was rejected. In mid-July, he asked the company president about the pro-

posal. The president rejected it. On July 28, 1980, Rickman was fired.

Rickman's efforts to have an air conditioner installed in his truck were undertaken, not only for his benefit, but also for the benefit of his fellow employees. He discussed his proposal with other drivers, they supported it, and he acted as their representative. Moreover, Woodline knew that Rickman was acting with the support of the other drivers. Thus, the efforts to install air conditioners were clearly concerted.

Rickman's efforts not only were concerted, but they were protected. Although Rickman violated the chain of command rule when he went to the president to press his campaign for air conditioners, there is substantial evidence to support the Board's finding that Rickman's discharge was, in reality, motivated by his protected activity. Moreover, there is little evidence to support Woodline's argument that it would have discharged him, even in the absence of his protected activity. Thus, the *Wright Line* Standard, *see Wright Line, Inc.*, 251 N.L. R.B. 1083, 105 L.R.R.M. 1169 (1980), approved by the Supreme Court in *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 403, 103 S.Ct. 2469, 2475, 76 L.Ed.2d 667 (1983), is satisfied. *See also Lemon Drop Inn v. NLRB*, 752 F.2d 323 (8th Cir.1985). The Board's findings as to Rickman are affirmed, and its remedial order with respect to him is enforced.

### (2) *The Springdale Violations*

On February 18, 1980, Woodline terminated all of its employees who worked at its Springdale terminal. Operations continued under an agreement between Woodline and ABE Trucking Company, which was run by Martin Huffmaster. The Board found that, under the agreement, Huffmaster did local pickup and delivery work in exchange for a percentage of the revenue from the local operation. Huffmaster purchased the trucks from Woodline, used its trailers and operated under its name and freight license. Huffmaster rented the Springdale terminal. Woodline insured Huffmaster's freight and paid his phone bills. Huffmaster hired Woodline's operations manager as his supervisor.

On the basis of the above findings, the Board found that Woodline violated the Act by closing the Springdale terminal, by terminating all employees, and by continuing the operation through its agent and alter ego Huffmaster, all because its employees engaged in union activities. It required Woodline and Huffmaster to cease and desist from interfering with employees in their exercise of rights guaranteed by section 7 of the Act, 29 U.S.C. § 157. It ordered Woodline and its alter ego Huffmaster jointly to reinstate all former Springdale employees (leaving them free to order their business relationship with one another as they wished); to make the former Springdale employees whole for any losses resulting from the closing of the terminal; to expunge from the record any reference to the discharges or layoffs; to reinstate its former practice of allowing line drivers to select assignments according to seniority; and to post appropriate notices.

Woodline asserts on appeal that the Board erred in finding that ABE Trucking was the alter ego of Woodline and thus erred in ordering the reinstatement of the Springdale employees. We find substantial evidence in the record to support the Board's alter ego finding.

The question of whether a new employer is an alter ego and thus equally obligated to remedy the original employer's unfair labor practices is a question of fact for the Board. *Southport Petroleum Co. v. NLRB*, 315 U.S. 100, 101–04, 62 S.Ct. 452, 453–55, 86 L.Ed.2d 718 (1942); *NLRB v. Campbell-Harris Electric, Inc.*, 719 F.2d 292, 295 (8th Cir.1983); *NLRB v. Scott Printing Corp.*, 612 F.2d 783 (3rd Cir. 1979). Factors to be considered by the Board in making this determination are: whether the change in operations is unlawfully motivated, whether the new employer is owned or controlled by the old employer, and whether the new operator has the same business purpose, operations, equipment, customers, management, and supervision as the old operation. *Campbell–*

*Harris Elec. Co.,* 719 F.2d at 295–96; *Scott Printing Co.,* 612 F.2d at 785–87.

### (a) *Motivation*

■ There can be little doubt that the Board's finding that Woodline transferred its Springdale terminal to Huffmaster to retaliate against the employees for their union activities is supported by substantial evidence on the record as a whole. Woodline has a long history of anti-union animus; the decision to transfer was not made until after Woodline was aware that a majority of the Springdale employees supported the union; and the manager of the Springdale operation told Huffmaster's brother that he was looking for an agent to run the terminal because Woodline was having union problems.

Woodline argues that it made the change for economic reasons. While there is some support in the record for this argument, the record contains substantial evidence which justifies the Board's decision to reject it.

### (b) *Control*

We likewise find substantial support in the record for the Board's finding that Woodline controlled ABE Trucking and Huffmaster. While ABE Trucking paid the employees, withheld all taxes and social security benefits, carried worker compensation benefits on employees, and administered day-to-day discipline, real control continued to rest with Woodline. The agreement between Woodline and Huffmaster was oral and could be cancelled at any time; Woodline arranged the financing for Huffmaster (an unemployed truck driver at the time the agreement was made); Huffmaster put up no money of his own; all bills of lading and other freight documents were in Woodline's name; and Woodline insured the freight.

### (c) *Business Purpose and Operation*

We find substantial support in the record for the Board's finding that Huffmaster operated the business in the same manner and mode as had Woodline. He performed precisely the same services as Woodline. Indeed, he held himself out to the public as if ownership in the Springdale operation had never changed. He served the same customers and followed the same procedures. There was no interruption in service. There was substantial continuity in management and supervision, and the terminal, trucks, and trailers continued to carry Woodline's name. Woodline also provided a telephone which was listed and answered as "Woodline Motor Freight."[1]

In light of the above, we hold that there is substantial evidence in the record to support the Board's finding that ABE Trucking was the alter ego of Woodline and accordingly enforce the Board's order in this respect.

### (3) *The Reinstatement of Gloria Fowlkes (Springdale)*

Gloria Fowlkes was employed at Springdale. She lost her job because Woodline transferred its Springdale operation to another location. Woodline argues that Fowlkes is not entitled to reinstatement because she was not named as a discriminatee and because she was a managerial employee. We find no merit to Woodline's first contention. The Board's complaint alleged that, "on or about February 18" Woodline "[c]losed its [Springdale] facility and terminated its employees working there." Fowlkes was an employee; thus, no prejudice was suffered by Woodline by failure to name her as a discriminatee. As to the issue of whether she was a managerial employee, the Board concedes that Woodline can raise this issue at the compliance hearing. It can also assert that she was discharged for a reason independent of the transfer.

### (4) *The Russellville Violations*

On January 9, 1981, Teamsters Local 878 notified Woodline it was engaged in a cam-

---

1. Huffmaster testified that the use of the Woodline name in advertising and telephone listing was "good business." All his customers were familiar with the name, and he didn't see any sense in changing it, as the change would be expensive. He stated, "I'm just a company hired to haul for Woodline, and I want to build up Woodline because it affects me."

paign to organize Woodline's employees at its Russellville terminal. The notice listed nine persons as members of the organizing committee. The local subsequently notified Woodline that it intended to organize all Woodline employees.

On January 10, Woodline's operations manager met with the terminal managers and told them that Woodline did not want a union. The next day the operations manager met with the employees at each terminal and told them that they did not need a union. Thereafter, various company supervisors engaged in a series of unfair labor practices at the Russellville terminal designed to discourage membership in the union. (Woodline, as previously noted, does not contest the fact that many of these unfair labor practices occurred.) The unfair labor practices culminated in a series of terminations and layoffs at Woodline's Russellville terminal, which in turn resulted in the discontinuance of much of the Russellville operations.

The Board's remedial order, among other things, required Woodline: to reinstate Russellville line drivers Lloyd, Dawson, Churchill, and Roach; to return to Russellville as many trucks as necessary to provide work for laid-off drivers (redomiciling trucks); to make the drivers whole for any losses resulting from Woodline's unlawful discrimination against them and other actions taken against its employees; and to reinstate its former practice of allowing line drivers to select assignments according to seniority. Woodline contends that the Board erred in requiring this relief.

### (a) Redomiciling Trucks to Russellville

The Board's order requiring Woodline to redomicile trucks to Russellville is appropriate. The Board stated that this remedy was necessary "to restore the status quo ante" and was not unduly burdensome in that it would not require capital investment disproportionate to Woodline's resources or impose substantial, continuing losses. The Board stated:

> [T]he line haul operation at Russellville was profitable before the discriminatory relocation. [Woodline's] showing that it

reduced its costs by eliminating some runs to and from that terminal is thus insufficient to make the remedy inappropriate. [Footnote: We cannot find on this record the economic impact of the redomicile. While [Woodline's] operating ratio, or profitability, improved dramatically after the relocation, that improvement cannot be attributed wholly to the Respondent's claimed reduction in empty miles, as other substantial operating changes were made in the same period. Moreover, [Woodline's] data on empty miles is itself inadequate to allow reliable calculations of the degree of reduction in empty miles.] Moreover, since the relocation [Woodline] has used less senior city drivers for line haul driving out of Russellville.

Nor would redomicile require significant capital investment. [Woodline] continues to operate the Russellville terminal and has not shown that it would be forced to purchase new equipment. We therefore find the redomicile of equipment back to Russellville, incident to the full reinstatement of discriminatees there, to be an appropriate remedy and we will order it.

Woodline concedes that it made operational changes, other than relocating the trucks from Russellville, which improved its profitability. It argues, however, that relocation was a major factor in increasing efficiency of operations, and thus it should not be required to undo what it has done. It further asserts that an offer of reinstatement at a terminal where the equipment was relocated, plus back pay, would make the laid off drivers whole for any loss suffered. It finally argues that the remedy is punitive rather than remedial.

There can be little doubt that Woodline's decision to redomicile tractors at the Russellville terminal in late January, 1981, was largely motivated by a desire to punish employees who actively supported the Teamsters union. The decision came without notice; it was timed to coincide with the union's organizational activities; its adverse impact was largely directed at union supporters; and the general manager made

several statements indicating a design to defeat the union. In a conversation with an employee, he stated that he had dealt with unions before and did not want to deal with them again. He stated "[w]e had 14 road drivers * * * in Russellville, now we've got four, and within the next 2–3 weeks we're not going to have them."

■ The more serious question is whether the Board's order requiring the trucks to be redomiciled should be enforced. The Board has broad remedial authority because the granting of such relief is peculiarly a matter of administrative competence. *Fibreboard Paper Products v. NLRB*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed. 2d 233 (1964). When an employer changes its operations for a discriminatory purpose, the appropriate remedy is ordinarily to restore the status quo. To avoid this result, an employer must show that such remedy will impose an undue or unfair burden on it. *Manley Transfer v. NLRB*, 390 F.2d 777 (8th Cir.1968). When a petitioner has complied with its terms, it will have available to it every legitimate alternative it had before it instituted the course of illegal conduct. *Id.*

■ In our view, the Board's order has not been shown to be unduly burdensome or punitive. First, only those tractors necessary to provide work for the six named employees, Rickman, Hogan, Roach, Lloyd, Dawson and Churchill, need be redomiciled. Thus, no additional capital investment is required. Second, Woodline has failed to meet its burden of showing that redomiciling the tractors to Russellville would cause it to operate unprofitably. While it asserts that the present operation is more profitable, its proof on this point was found by the Board to be insufficient. We find insufficient evidence in the record which would permit us to substitute our decision for the Board's. Third, Woodline contends that providing jobs for the laid-off drivers at a new location, plus back pay for time lost, would satisfy the remedial purposes of the Act. Had the Board mandated this remedy, we would have approved it. But, it did not and the record here does not permit us to substitute our judgment for that of the

Board. We, therefore, enforce the Board's order with respect to redomiciling trucks in Russellville.

(b) *Making Kenneth Lloyd, Charles Churchill, and C.L. Dawson Whole*

Woodline does not contest the fact that Lloyd, Churchill, and Dawson were laid off for engaging in union activities. It objects, however, to the recommended remedy of reinstating them. It argues that each received a valid, unconditional recall, that each rejected the offer, and that such rejection terminated the obligation to reinstate them and tolled its back pay obligation.

Lloyd was recalled on May 7, Churchill on September 11, and Dawson on September 17. The Board found that each employee did not report for work after the recall because of a reasonable fear of further discrimination. It stated in support of that finding:

> We note that [Woodline] discriminated against union adherents in work assignments at Russellville, beginning before its 7 May 1981, offers to Lloyd and Whitbey and continuing through 1981, including discrimination against Whitbey, Clayton, and Lanthorn after they accepted reinstatement. It also discharged Hogan discriminatorily immediately before its offers to Dawson and Churchill. It would thus be unreasonable to expect these discriminatees to abandon their interim employment for the uncertainty of [Woodline's offer]. See *Flatiron Materials*, 250 NLRB 554 (1980). [footnote omitted]

■ A careful review of the record convinces us that this finding as to each employee is supported by substantial evidence on the record as a whole. We would add that the company does not appear to be substantially prejudiced by the Board's order because each employee's interim earnings must be deducted from any back pay award. We also agree with the Board that a discriminatee does not waive reinstatement by a negative response to an invalid offer, because he may well change his mind when faced with a valid offer. *See Florida*

*Steel Corp.*, 273 N.L.R.B. No. 118, 118 L.R.R.M. 1359 (Dec. 14, 1984).

■ Here, Woodline's unfair labor practices were egregious and continuous. Under these circumstances, the Board did not err in finding that the employees in question had a reasonable fear that they would be discriminated against if they returned and that as a result they might well earn less than they were earning in their interim jobs.

### (c) *Seniority Rights With Respect to Work Assignments*

On April 16, 1981, the Board filed an unfair labor practice complaint against Woodline. The Board alleged that Woodline unlawfully reduced the work available to the Russellville drivers remaining on the job after January 28. Thereafter, Woodline discontinued the practice of allowing drivers to select available runs according to seniority. The Board found that the change was unlawfully motivated and violated the Act. It ordered the company to reinstate its former practice of allowing line drivers to select assignments according to seniority.

Woodline asserts that the Board erred in finding that the change was unlawfully motivated. It claims that it made the change to ensure compliance with the National Labor Relations Act. It also contends that the remedy is inappropriate because the conditions have changed since the order was issued, in that the company's volume has dramatically increased and more line haul equipment is located at points other than Russelville.

■ We find no merit to Woodline's claim that the change was not made because of the filing of the unfair labor practice charge. Substantial evidence supports the Board's finding of an unfair labor practice. Indeed, the manager conceded that he made the change because of the complaint. When questioned by a driver as to why he had made the change, he stated he did so "because of the letter he got from the Labor Board stating that Woodline was intentionally cutting hours." When the employee stated that he didn't think it was fair, the manager replied, "You made the charge, I didn't."

As to Woodline's second contention, we recognize that there will be a changed situation when the Russellville terminal is reopened, the trucks redomiciled, and the employees recalled at that location. There will still be vehicles located at other points. These changed conditions can be accommodated as long as the *essential right to select runs on the basis of seniority at the Russellville terminal is preserved.* The details should be worked out at a compliance hearing.

### (d) *The Discharge of William Roach (Russellville)*

■ Woodline concedes that it violated the Act by reducing the number of runs to which Roach was assigned. It denies that it discharged him and objects to the Board's order requiring his reinstatement. We do not believe that substantial evidence supports the Board's finding that Roach was constructively discharged. To the contrary, the record supports Woodline's view that his runs were reduced for a short period of time, after which he accepted other full-time employment and declined runs offered by Woodline. It follows that the appropriate remedy would account for his wage loss from January 28, 1981, until March 2, 1981, less any sums earned in other employment and any sums which he could have earned by accepting the runs offered by Woodline.

The Board's application for enforcement of its order is granted, with the exceptions noted herein.

ROSS, Senior Circuit Judge, concurring and dissenting.

I concur in all sections of the opinion, except paragraph (4)(a). I would not require Woodline Motor Freight, Inc. to redomicile tractors to Russellville.