**MID–SOUTH BOTTLING COMPANY, Petitioner, Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross–Petitioner.**

No. 88–4243.

United States Court of Appeals, Fifth Circuit.

June 30, 1989.

Kenneth E. Milam, R. Pepper Crutcher, Jr., Jackson, Miss., for petitioner, cross-respondent.

---

Aileen Armstrong, Deputy Assoc. General Counsel, NLRB, Fred L. Cornnell, Washington, D.C., for respondent, cross-petitioner.

Thomas Chad Farris, Deborah A. Jeon, Little Rock, Ark., for intervenor.

Before REAVLEY, WILLIAMS and JONES, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Mid–South Bottling Company appeals the National Labor Relations Board's remedial order directing Mid–South to reopen and resume operations of one of its facilities. While Mid–South does not dispute the findings by the Board or the Administrative Law Judge (ALJ) that it committed unfair labor practices including the closure of its facility, Mid–South does dispute the remedy. It argues that the Board abused its discretion. Mid–South urges that a less severe remedy is appropriate because reopening would be unduly burdensome. Mid–South further claims that the facility would have been closed anyway due to its unprofitability and the partial collapsed roof of the warehouse, the main building of the facility. After a careful review of the record, we find Mid–South's assertions unsupported by the record and enforce the remedial order of the Board.

## I. Facts and Prior Proceedings

Mid–South was formed as a holding company in 1982 by the leveraged buy-out of several Pepsi bottling and distribution enterprises in Arkansas, Louisiana, Mississippi, and Tennessee that bottled, distributed, and sold soft drinks. In early 1986, Mid–South, operating through three divisions, controlled 20 subsidiaries. The subsidiaries operated more than 20 distribution facilities, including the Forrest City facility, the facility that is the subject of this appeal.

On January 1, 1986, Mid–South transferred the Forrest City soft drink distribution facility to a subsidiary in the Arkansas Division from a subsidiary in the Mississippi–Tennessee Division. The Forrest City facility had been in use for about 60 years, and the main building, which was the warehouse, was in poor condition and had been so for some time.

On January 17, 1986, Mid–South was informed that a sufficient number of its employees at the Forrest City facility had signed authorization cards to warrant representation by the International Union of Electronic, Electrical, Technical, Salaried, and Machine Workers, AFL–CIO ("Union"). An election campaign then ensued and the Union won. During the campaign Mid–South officials attempted to defeat the Union by, among other things, threatening to close the facility if the Union won the election.

The Company then filed objections to the election. The Union responded by bringing charges of unfair labor practices against the Company. After negotiations initiated by Mid–South, the Union agreed to drop the unfair labor allegations in exchange for the Company's withdrawal of objections to the election and the promise to recognize and negotiate in good faith with the Union. The Union was certified finally on April 28, 1986, as the exclusive bargaining representative of the employees.

On May 5, only a few days after having been certified, the Union was informed by telegram that the facility was going to be shut down, and at the close of business on May 9, it was. On June 24, 1986, the Union filed new charges of unfair labor practices against Mid–South, including the improper closure of the facility.

After hearings the Administrative Law Judge found numerous unfair labor practice violations by Mid–South. Specifically, the ALJ found Mid–South violated Section 8(a)(1) of the National Labor Relations Act by threatening to close the facility if the Union was elected, threatening individuals with the loss of their jobs and benefits and with other reprisals, and interrogating workers regarding their union activity. 29 U.S.C. § 158(a)(1). He also found violations of Sections 8(a)(1) and (3) by the Company's issuance of warnings, its enforce-

ment of work rules more strictly, and its withholding or changing the employees' benefits because of their support for the Union. 29 U.S.C. § 158(a)(1) and (3). He further found violation of Sections 8(a)(1) and (3), in that the Company had closed the Forrest City facility because of the employees' selection of Union representation. *Id.* Finally, he found Section 8(a)(5) was violated by the Company when it refused to bargain with the Union over its decision to close the facility and transfer its operations and when it refused to furnish the Union with the relevant information needed for collective bargaining. 29 U.S.C. § 158(a)(5).

On appeal to the NLRB, the ALJ's decision was upheld unanimously with only some modifications on the factual findings. *Mid–South Bottling Co.,* 287 N.L.R.B. No. 146, 1987–88 NLRB Dec. (CCH) ¶ 19262 (1988). The Board affirmed the ALJ's order requiring the Company to cease and desist from the unfair labor practices and from in any manner interfering with, restraining, or coercing employees in the exercise of their rights protected by the Act. The affirmance also required the Company to reestablish and resume operations of the Forrest City facility. The Company was further required to offer full and immediate reinstatement to the discriminatees. Reinstatement was ordered to include deleting any reference to termination in the employees' files and making them whole, with interest, for any loss of earnings and other benefits they suffered as a result of the discrimination against them. Finally, the order required the Company to recognize and bargain with the Union upon request and to treat the initial certification year as beginning on the date of compliance with the order, to mail appropriate notice to each employee, and to post the notices after the reestablishment of the Forrest City facility.

1. Mid–South does argue that the Board did not adequately set out the basis of its decision. It is well-settled, however, that the Board fully satisfies that requirement in cases in which it affirms and adopts as its own the rationale of the ALJ, as the Board did here. *NLRB v. Horizon*

Before this Court, Mid–South does not contest any of the unfair labor practice findings of the Board.[1] The Company only contests the part of the remedial order that requires it to resume operating the Forrest City facility.

## II. *Scope of Review*

Section 10(c) of the Act vests the NLRB with broad authority to "devise remedies to effectuate the policies of the Act." *NLRB v. Seven–Up Bottling Co.,* 344 U.S. 344, 346, 73 S.Ct. 287, 289, 97 L.Ed. 377 (1953). In fashioning its remedies, "the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts." *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 1939, 23 L.Ed.2d 547 (1969). Our review then "is quite limited." *NLRB v. Lighthouse for the Blind,* 696 F.2d 399, 404 (5th Cir.1983). An employer seeking to set aside an order of the Board faces the "rigorous task" of showing that the order is " 'a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.' " *Statler Industries, Inc. v. NLRB,* 644 F.2d 902, 909–10 (1st Cir.1981) (quoting *Virginia Electric & Power Co. v. NLRB,* 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943)).

## III. *NLRB's Long–Standing Policy: Restore the Status Quo Ante the Unfair Labor Practices as Nearly as Possible*

■ The answer as to whether the Board should order the resumption of operations as a remedy for unfair labor practices is closely tied to the facts of each case. No per se rule can be stated. The restoration of the status quo ante the unfair labor practices is, however, prima facie the appropriate remedy where an employer closes a part of its operation for discriminatory purposes. *Fibreboard Paper Products*

*Air Services, Inc.,* 761 F.2d 22, 24 n. 1 (1st Cir.1985).

A detailed account of Mid–South's flagrant unfair labor violations is found in the Board's decision and attached ALJ's decision, 287 N.L.R.B. No. 146 (1988).

*Corp. v. NLRB,* 379 U.S. 203, 215–17, 85 S.Ct. 398, 405–06, 13 L.Ed.2d 233 (1964); *Woodline Motor Freight, Inc. v. NLRB,* 843 F.2d 285, 291 (8th Cir.1988); *Statler Industries,* 644 F.2d at 909–10; *Town & Country Mfg. Co.,* 136 N.L.R.B. No. 1022, 1962 NLRB Dec. (CCH) ¶ 11100 (1962), *enforced,* 316 F.2d 846, 847 (5th Cir.1963). The restoration order is designed to "restore the parties to the situation that existed prior to the commission of the unfair labor practices." *Manley Transfer Co. v. NLRB,* 390 F.2d 777, 782 (8th Cir.1968). Because Mid–South concedes on appeal the finding by the Board that the closure of the plant was for discriminatory purposes, reopening the facility was prima facie the correct remedy.

■ Mid–South could have avoided the imposition of the restoration order by showing that restoration of the status quo ante either imposed "an undue or unfair burden on it," *Fibreboard Paper Products,* 379 U.S. at 216, 85 S.Ct. at 406, or threatened its viability as a company. The threshold to establishing its burden is high. *See Woodline Motor Freight,* 843 F.2d at 290–91 (holding that the restoration order was not unduly burdensome where it "would not require capital investment disproportionate to [the employer's] resources or impose substantial, continuing losses"); *NLRB v. Jackson Farmers, Inc.,* 457 F.2d 516, 518 (10th Cir.1972) (resumption of operations "although it is severe" is "not a prohibited remedy"); *Rebel Coal Co.,* 259 N.L.R.B. No. 258, 1981 NLRB Dec. (CCH) ¶ 18662 (1981) (restoration order appropriate where no basis to conclude remedy would be "unduly burdensome or endanger [employer's] continued viability"); *Purolator Armored, Inc.,* 268 N.L.R.B. No. 1268, 1983–84 NLRB Dec. (CCH) ¶ 16128 (1984) (restoration order "unduly burdensome" where credited evidence showed employer in a "financially unprofitable operation" suffering from "long and extensive" and "extreme" financial losses); *Great Chinese*

*American Sewing Co.,* 227 N.L.R.B. No. 1670, 1976–77 NLRB Dec. (CCH) ¶ 17860 (1977), *enforced,* 578 F.2d 251 (9th Cir. 1978) (restoration order "unduly burdensome" where small employer was unprofitable, having suffered significant financial losses over a substantial period of time). After reviewing the record, we find that the Board did not abuse its discretion. Mid–South failed to show that restoration would be either "unduly burdensome," would "endanger its continued viability," or any reason why it should be afforded relief under any other ground.[2]

### A. Costs to Reopen Forrest City Facility: Not Unduly Burdensome

Mid–South estimates that the immediate costs of reopening Forrest City would total about $378,000, including about $228,000 for vehicles, computer equipment, and furnishings, and $150,000 to repair the warehouse roof and other fixtures. It also estimates additional costs for operating the facility for the next year would be around $386,000.

The Board found these cost estimates to be exaggerated and lacking in reliability. The record as a whole contains substantial evidence to support this finding, *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 491, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951). First, much of the equipment needed for the reopened facility is still available. When Forrest City was closed, much of the equipment was simply sent to other distribution facilities within Mid–South and thus could be transferred back with a minimum of cost. Second, as to the necessary workers and managers needed to operate the facility, many of the ones who were working at Forrest City before its closure still are employed by Mid–South and are receiving roughly the same salary as they did at Forrest City. Thus, when they are transferred back to Forrest City, the overall cost to the Company for operations should not

---

**2.** Courts have found other situations where reestablishment would not be appropriate even without a showing of undue burden or threatened viability. *See Statler Industries,* 614 F.2d at 910 (The court lists fact situations where remedy found not to be appropriate.); *see generally* Annotation, Propriety of NLRB Order to Resume Discontinued Operations, 42 ALR Fed. 421 (1979).

increase significantly although it will ultimately be determined by collective bargaining. The figure of $228,000 is simply not supported by the evidence.

As to the cost to rehabilitate the facility, even if we accept the estimated cost to repair the warehouse as being around $150,000, Mid–South clearly has the resources to repair it and in other similar situations has done just that. Around the same time as the shutdown of Forrest City, Mid–South admits it had just completed a new $400,000 facility in Batesville. The Company had also just recently built a facility for $250,000 in Monticello and expended funds to repair the facility in Little Rock. The investment involved here is not shown to be out of line with the typical capital investments that the Company makes for its facilities. Further, at the time of the transfer to the Arkansas division, management was contemplating expenditures for roof repair. Forcing the repair only follows through on the Company's plans before the unfair labor practices began.[3]

As to the costs for operating the facility for the next year, the Company has failed to show these costs to be unduly burdensome in light of the past performance of the facility. The record shows that in the first seven months of operations in 1986, the two Arkansas subsidiaries—one of them including Forrest City—had total net sales of about $19 million, a total operating income of about $2 million, and a combined net profit of $541,000. Forrest City's March 1986 production also significantly exceeded its 1986 February production, its March 1985 production, as well as its targeted production level for March 1986. Among the six facilities within the Arkansas division, only the brand new one in Batesville actually did better than Forrest City. Further, Forrest City was closed down just before the high volume season for selling soft drinks, the summer. The projection under the evidence is that the production level would have gotten better.

Because the evidence presented actually supports the profitability of the Forrest City facility compared to the other distribution facilities within its division, the Board did not abuse its discretion in ordering Mid–South to reopen the Forrest City facility. While some capital will have to be expended, it is not an undue burden. The expenditure is not "disproportionate" to Mid–South's resources, especially in light of the probable profits from the facility. *Woodline Motor Freight*, 843 F.2d at 290.

B. *The Viability of Mid–South*

The Board's order becomes even more credible when Mid–South's situation as a whole is viewed. For the year 1985, the Company had an operating income of $12.1 million with net sales of $178.6 million. For 1986, the Company projected net sales of $180.2 million and an operating income of $15.1 million.[4] In any event Mid–South did not argue that the capital expenditure involved in the reopening of Forrest City will endanger the viability of the Company as a whole. The company's contentions focussed upon its "undue burden" argument and its defense of "inevitable closure" regardless of the Union activity.

IV. *The Appropriateness of a Less Severe Remedy*

■ The main thrust of Mid–South's argument is that a different and lesser remedy is appropriate because it would have eventually closed the Forrest City facility anyway because of the partial roof collapse in July or because of the unprofitability of the operation.[5] The Company argues then

---

3. See Section IV.

4. The Company did project a net loss as a whole in 1986; however, the loss was attributable to interest expenses from the large debt incurred during the company's formation. There is no suggestion that the Company was financially distressed. The debt situation is typical for leveraged buy-outs.

5. In a subsequent motion to this Court, Mid–South further argued that even if the decision by the Board was correct at the time it was made, the situation of the warehouse has deteriorated even more so that it is clearly not appropriate now to order reopening. As proof of the destruction of the building, Mid–South offered proof that the building has now been condemned. We do not need to address this

that the unfair labor practice was only the acceleration of the inevitable closure of the facility. The record reflects, however, the Company's failure to demonstrate either the unprofitability of the facility or that the roof would have resulted in the closure of the facility when it collapsed.

As to the profitability of Forrest City, Mid–South concedes that the company as a whole is increasingly more profitable. Mid–South asserts, however, that the Forrest City facility had been increasingly less profitable for the past four years.[6] But Mid–South admitted that it actually has no profit and loss records other than the ones for 1986. The only evidence then in the record is of 1986 and those figures suggest that the facility was at least as profitable as the other distribution facilities up to its closure.[7]

Mid–South points to evidence suggesting that it was contemplating closure as early as the time of the transfer to the Arkansas division. Evidence was presented that the Company had determined it would either make the facility profitable so as to justify a capital expenditure of $400,000 for a new facility or it would close the facility. Mid–South however failed to show any reason other than the certification of the Union as to why it refused to make the capital expenditure and instead chose to close Forrest City. The Board did not abuse its discretion by finding the economic justification was pretextual.

Mid–South also failed to carry the burden of proof of showing that Forrest City will be unprofitable in the future. The cases relied upon by Mid–South are distinguishable. See, for example, *NLRB v. Major*, 296 F.2d 466, 468 (7th Cir.1961) (restoration order was not enforced where employer had legitimate economic reasons to cease operations before union activity began but then unlawfully "speeded up" implementation of the decision because of union activity); *Bridgford Distributing Co.*, 229 N.L.R.B. No. 678, 678–79, 1977–78 NLRB Dec. (CCH) ¶ 18164 (1977) (restoration order not required where employer's decision to transfer its operations was based on legitimate economic reasons but unlawfully "accelerated" in response to subsequent union activity); *Great Chinese American Sewing Company*, 227 N.L.R.B. at 1670–71 (the Board will not "force the reestablishment of an unprofitable operation"). An additional major distinction between these cases and the instant case is that in these cases the court was remedying the failure to bargain over the closure. Actual closure itself was not an unfair labor practice. In the case before us the Board found that the closing itself was an unfair labor practice—not a valid business judgment.

The Board properly relied on several cases where the employer was required to resume operations. *See R & H Masonry Supply, Inc.*, 238 N.L.R.B. No. 1044, 1978–79 NLRB Dec. (CCH) ¶ 15250 (1978), *enforced in part and remanded in part*, 627 F.2d 1013 (9th Cir.1980), *reopening order deleted on remand*, 258 N.L.R.B. No. 1220, 1981–82 NLRB Dec. (CCH) ¶ 18402 (1981) (the court allowed the remedy of reopening a plant where the closed operation had operated profitably for nine of the sixteen months prior to closing but then on remand deleted the remedy because of the small size of the company and the low profit margin); *Rebel Coal Company*, 259 N.L.R.B. No. 258, 1981–82 NLRB Dec. (CCH)

issue because properly we address only the validity of the Board's order at the time made. We note that continuing deterioration is inevitable due to Mid–South's neglect of the facility. Mid–South should not be allowed to profit from its failure to prevent further destruction during the delay brought about by its unsuccessful appeal.

**6.** Mid–South points to the projected loss for 1986 for the Forrest City facility as evidence that the facility was unprofitable. However, the loss is the result of the payment of the initial debt for the formation of the company as a whole. All the operations show a loss because of this debt; thus, if this were the standard for closure that Mid–South used, all the facilities would have been closed. *See supra* note 4.

**7.** See Section II. A. Other evidence in the record supporting the finding of the Board includes testimony by several of the employees that one of the supervisors in January actually told the employees that Forrest City was one of their most profitable distribution centers.

¶ 18662 (1981) (court allowed the remedy of reopening auto repair shop finding that it had been closed solely because of the prospect of increased wages due to a newly elected union without any other valid evidence of inevitable closure); *Service Merchandise Co.*, 278 N.L.R.B. No. 23, 1985–86 NLRB Dec. (CCH) ¶ 17730 (1986) (company ordered to reestablish in-house trucking operation where it had subcontracted the work solely to avoid union obligations). In each of these cases, as is in Mid–South's situation, the employer failed to demonstrate the inevitable closure of the plant for reasons other then the unfair labor practices. *See also Trey Packing, Inc.*, 172 N.L.R.B. No. 291, 1968–2 NLRB Dec. (CCH) NLRB ¶ 20001 (1968), *enforced*, 405 F.2d 334 (2nd Cir.1968), *cert. denied*, 394 U.S. 919, 89 S.Ct. 1191, 22 L.Ed.2d 452 (1969) (employer ordered to reopen distribution operation).

Mid–South argues that these cases are distinguishable because they do not involve as extreme a remedy as is involved here since none of them required the type of capital expenditure needed here. While we are aware of the severity of the award, Mid–South is a much larger operation than the employers in those cases and is proportionally much more able to withstand this order. Also, the remedy of reestablishment is "based on the Board's policy that the wrongdoer, rather than the innocent victim, should bear the hardships of the unlawful action." *Monongahela Steel Co.*, 265 N.L.R.B. No. 262, 1982–83 NLRB Dec. (CCH) ¶ 15331 (1982) (NLRB ordered a steel company to reestablish a plant that had been closed unlawfully).

As to the roof collapse, the record also does not establish that Mid–South would have shut down operations because of it. The Company made the decision to transfer the Forrest City facility to the Arkansas division with full knowledge of the state of the warehouse. It was willing at that time to build a new facility at the cost of $400,-000 if the operations proved to be profitable. The evidence then suggests that the state of the roof was a subsidiary issue to the Company. In light of the profitability of Forrest City, Mid–South failed to prove that the change in its attitude as to repairs was for any reason other than the fact that the Union was elected.

Mid–South argues on appeal that there is no proof in the record to establish that it would have continued operating the facility after the roof collapsed. The Company's argument is specious. The Company had the burden of proving it would not have continued the operation. The strongest evidence introduced by Mid–South on this issue was the estimate for cost of repair. That evidence was properly discounted by the Board in light of the recent expenditures of Mid–South on other facilities and the fact Mid–South was willing to make an even greater expenditure at Forrest City before the Union entered the picture.

Because Mid–South admits the closure of Forrest City was motivated unlawfully, it had the burden of proving that the plant would have inevitably closed in order for a less severe remedy to have been appropriate. It failed to show that unprofitability or that the condition of the roof would have mandated the facilities' closure eventually regardless of the unfair labor practices. By not challenging the unfair labor practice findings, the Company concedes that a significant unlawful technique it used during the election campaign was to threaten to close the facility if collective bargaining won. Less than two weeks after the Union was certified, the Company did so.

## V. *Conclusion*

The Board's decision ordering the Company to resume operation of the Forrest City facility is supported by substantial evidence in the record considered as a whole and was within its discretion.

ORDER ENFORCED.

EDITH H. JONES, Circuit Judge, dissenting:

I respectfully dissent. Although the company did not contest the unfair labor practice citation, I believe that ordering Mid–South to establish an entirely new Forrest City facility, at a cost of hundreds of thousands of dollars, is too drastic a reme-

dy. The majority and NLRB have unrealistically minimized the company's cost of reopening in light of its need to build a new facility from scratch and, as a highly-leveraged company, to avoid creating redundant and inefficient distribution systems. The profitability of this facility, never as rosy as the majority portrays, cannot be as high in the future because of the elevated reopening costs and the fact that it will divide business with other Mid–South facilities. One also wonders whether and how the employees will benefit from being relocated to Forrest City only three years after they were moved out. It is likely that Mid–South will have to hire an entirely new cadre of employees who may or may not have selected union representation. It would have been far more sensible for the NLRB to order Mid–South to compensate the former Forrest City employees for their likely union wages until an estimated reasonable closing date. The remedy selected by the NLRB seems so draconian and pointless that in this unusual case I would hold it an abuse of discretion.